## McCLANAHAN *v.* ARIZONA STATE TAX COMMISSION

No. 71–834.   Argued December 12, 1972—Decided March 27, 1973

MARSHALL, J., delivered the opinion for a unanimous Court.

*Richard B. Collins* argued the cause for appellant. With him on the briefs were *Donald Juneau* and *Theodore R. Mitchell.*

*James D. Winter,* Assistant Attorney General of Arizona, argued the cause for appellee. With him on the brief was *Gary K. Nelson,* Attorney General.

*Harry R. Sachse* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Frizzell, Deputy Solicitor General Wallace, Edmund B. Clarke,* and *Carl Strass.**

---

*Briefs of *amici curiae* urging reversal were filed by *Charles A. Hobbs* for the National Congress of American Indians; by *David H. Getches* for the Native American Rights Fund; and by *Samuel W. Murphy, Jr.,* and *William C. Pelster* for Montana Inter-Tribal Policy Board.

*William D. Dexter,* Assistant Attorney General of Washington, and *Eugene F. Corrigan* filed a brief for Multistate Tax Commission as *amicus curiae* urging affirmance.

*Mr. Hobbs, Pierre J. LaForce,* and *R. Don Mahan* filed a brief for the Estate of Rose Mason as *amicus curiae.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

This case requires us once again to reconcile the plenary power of the States over residents within their borders with the semi-autonomous status of Indians living on tribal reservations. In this instance, the problem arises in the context of Arizona's efforts to impose its personal income tax on a reservation Indian whose entire income derives from reservation sources. Although we have repeatedly addressed the question of state taxation of reservation Indians,[1] the problems posed by a state income tax are apparently of first impression in this Court.[2] The Arizona courts have held that such state taxation is permissible. 14 Ariz. App. 452, 484 P. 2d 221 (1971). We noted probable jurisdiction, 406 U. S. 916 (1972), and now reverse. We hold that by imposing the tax in question on this appellant, the State has interfered with matters which the relevant treaty and statutes leave to the exclusive province of the Federal Government and the Indians themselves. The tax is therefore unlawful as applied to reservation Indians with income derived wholly from reservation sources.

I

Appellant is an enrolled member of the Navajo tribe who lives on that portion of the Navajo Reservation located within the State of Arizona. Her complaint al-

---

[1] See, e. g., Oklahoma Tax Comm'n v. United States, 319 U. S. 598 (1943); Childers v. Beaver, 270 U. S. 555 (1926); United States v. Rickert, 188 U. S. 432 (1903); The Kansas Indians, 5 Wall. 737 (1867). Cf. Squire v. Capoeman, 351 U. S. 1 (1956).

[2] State courts have disagreed on the question. Compare Ghahate v. Bureau of Revenue, 80 N. M. 98, 451 P. 2d 1002 (1969), with Commissioner of Taxation v. Brun, 286 Minn. 43, 174 N. W. 2d 120 (1970). See Powless v. State Tax Comm'n, 22 App. Div. 2d 746, 253 N. Y. S. 2d 438 (1964); State Tax Comm'n v. Barnes, 14 Misc. 2d 311, 178 N. Y. S. 2d 932 (1958).

leges that all her income earned during 1967 was derived from within the Navajo Reservation. Pursuant to Ariz. Rev. Stat. Ann. § 43–188 (f) (Supp. 1972–1973), $16.20 was withheld from her wages for that year to cover her state income tax liability.[3]  At the conclusion of the tax year, appellant filed a protest against the collection of any taxes on her income and a claim for a refund of the entire amount withheld from her wages.  When no action was taken on her claim, she instituted this action in Arizona Superior Court on behalf of herself and those similarly situated, demanding a return of the money withheld and a declaration that the state tax was unlawful as applied to reservation Indians.

The trial court dismissed the action for failure to state a claim, and the Arizona Court of Appeals affirmed. Citing this Court's decision in *Williams* v. *Lee,* 358 U. S. 217 (1959), the Court of Appeals held that the test "is not whether the Arizona state income tax infringes on plaintiff's rights as an individual Navajo Indian, but whether such a tax infringes on the rights of the Navajo tribe of Indians to be self-governing."  14 Ariz. App., at 454, 484 P. 2d, at 223.  The court thus distinguished cases dealing with state taxes on Indian real property on the ground that these taxes, unlike the personal income tax, infringed tribal autonomy.

---

[3] The liability was created by Ariz. Rev. Stat. Ann. § 43–102 (a) (Supp. 1972–1973) which, in relevant part, provides: "There shall be levied, collected, and paid for each taxable year upon the entire net income of every estate or trust taxable under this title and of every resident of this state and upon the entire net income of every nonresident which is derived from sources within this state, taxes in the following amounts and at the following rates upon the amount of net income in excess of credits against net income provided in §§ 43–127 and 43–128." Appellant conceded below that she was a "resident" within the meaning of the statute, and that question, which in any event poses an issue of state law, is not now before us.

The court then pointed to cases holding that state employees could be required to pay federal income taxes and that the State had a concomitant right to tax federal employees. See *Helvering* v. *Gerhardt,* 304 U. S. 405 (1938); *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466 (1939). Reasoning by analogy from these cases, the court argued that Arizona's income tax on individual Navajo Indians did not "[cause] an impairment of the right of the Navajo tribe to be self governing." 14 Ariz. App., at 455, 484 P. 2d, at 224.

Nor did the court find anything in the Arizona Enabling Act, 36 Stat. 557, to prevent the State from taxing reservation Indians. That Act, the relevant language of which is duplicated in the Arizona Constitution, disclaims state title over Indian lands and requires that such lands shall remain "under the absolute jurisdiction and control of the Congress of the United States." 36 Stat. 569. But the Arizona court, relying on this Court's decision in *Organized Village of Kake* v. *Egan,* 369 U. S. 60 (1962), held that the Enabling Act nonetheless permitted concurrent state jurisdiction so long as tribal self-government remained intact. Since an individual income tax did not interfere with tribal self-government, it followed that appellant had failed to state a claim. The Arizona Supreme Court denied a petition for review of this decision, and the case came here on appeal. See 28 U. S. C. § 1257 (2).

## II

It may be helpful to begin our discussion of the law applicable to this complex area with a brief statement of what this case does not involve. We are not here dealing with Indians who have left or never inhabited reservations set aside for their exclusive use or who do not possess the usual accoutrements of tribal self-govern-

ment. See, *e. g., Organized Village of Kake* v. *Egan, supra; Metlakatla Indian Community* v. *Egan,* 369 U. S. 45 (1962); *Oklahoma Tax Comm'n* v. *United States,* 319 U. S. 598 (1943). Nor are we concerned with exertions of state sovereignty over non-Indians who undertake activity on Indian reservations. See, *e. g., Thomas* v. *Gay,* 169 U. S. 264 (1898); *Utah & Northern R. Co.* v. *Fisher,* 116 U. S. 28 (1885). Cf. *Surplus Trading Co.* v. *Cook,* 281 U. S. 647, 651 (1930). Nor, finally, is this a case where the State seeks to reach activity undertaken by reservation Indians on nonreservation lands. See, *e. g., Mescalero Apache Tribe* v. *Jones, ante,* p. 145. Rather, this case involves the narrow question whether the State may tax a reservation Indian for income earned exclusively on the reservation.

The principles governing the resolution of this question are not new. On the contrary, "[t]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history." *Rice* v. *Olson,* 324 U. S. 786, 789 (1945). This policy was first articulated by this Court 141 years ago when Mr. Chief Justice Marshall held that Indian nations were "distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied by the United States." *Worcester* v. *Georgia,* 6 Pet. 515, 557 (1832). It followed from this concept of Indian reservations as separate, although dependent nations, that state law could have no role to play within the reservation boundaries. "The Cherokee nation . . . is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in

conformity with treaties, and with the acts of Congress. The whole intercourse between the United States and this nation, is, by our Constitution and laws, vested in the government of the United States." *Id.*, at 561. See also *United States* v. *Kagama*, 118 U. S. 375 (1886); *Ex parte Crow Dog*, 109 U. S. 556 (1883).

Although *Worcester* on its facts dealt with a State's efforts to extend its criminal jurisdiction to reservation lands,[4] the rationale of the case plainly extended to state taxation within the reservation as well. Thus, in *The Kansas Indians*, 5 Wall. 737 (1867), the Court unambiguously rejected state efforts to impose a land tax on reservation Indians. "If the tribal organization of the Shawnees is preserved intact, and recognized by the political department of the government as existing, then they are a 'people distinct from others,' capable of making treaties, separated from the jurisdiction of Kansas, and to be governed exclusively by the government of the Union. If under the control of Congress, from necessity there can be no divided authority." *Id.*, at 755. See also *The New York Indians*, 5 Wall. 761 (1867).

It is true, as the State asserts, that some of the later Indian tax cases turn, not on the Indian sovereignty doctrine, but on whether or not the State can be said to have imposed a forbidden tax on a federal instrumentality. See, *e. g., Leahy* v. *State Treasurer of Oklahoma*, 297 U. S. 420 (1936); *United States* v. *Rickert*, 188 U. S. 432 (1903). To the extent that the tax exemption rests on federal immunity from state taxation, it may well be inapplicable in a case such as this involving an individual

---

[4] See also *Williams* v. *United States*, 327 U. S. 711 (1946); *United States* v. *Chavez*, 290 U. S. 357 (1933); *United States* v. *Ramsey*, 271 U. S. 467 (1926).

income tax.[5]   But it would vastly oversimplify the problem to say that nothing remains of the notion that reservation Indians are a separate people to whom state jurisdiction, and therefore state tax legislation, may not extend.   Thus, only a few years ago, this Court struck down Arizona's attempt to tax the proceeds of a trading company doing business within the confines of the very reservation involved in this case.   See *Warren Trading Post Co.* v. *Arizona Tax Comm'n,* 380 U. S. 685 (1965).   The tax in no way interfered with federal land or with the National Government's proprietary interests.   But it was invalidated nonetheless because "from the very first days of our Government, the Federal Government had been permitting the Indians largely to govern themselves, free from state interference." *Id.,* at 686–687.[6]   As a leading text on Indian problems summarizes the relevant law: "State laws generally are

---

[5] The federal-instrumentality doctrine does not prohibit state taxation of individuals deriving their income from federal sources. See *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466 (1939).   Cf. *Leahy* v. *State Treasurer of Oklahoma,* 297 U. S. 420 (1936).   The doctrine has, in any event, been sharply limited with respect to Indians.   See *Oklahoma Tax Comm'n* v. *United States,* 319 U. S. 598 (1943).

[6] The court below distinguished *Warren Trading Post* as limited to cases where the Federal Government has pre-empted state law by regulating Indian traders in a manner inconsistent with state taxation.   14 Ariz. App. 452, 455, 484 P. 2d 221, 224.   But although the Court was, no doubt, influenced by the federal licensing requirements, the reasoning of *Warren Trading Post* cannot be so restricted. The Court invalidated Arizona's tax in part because "Congress has, since the creation of the Navajo Reservation nearly a century ago, left the Indians on it largely free to run the reservation and its affairs without state control, a policy which has automatically relieved Arizona of all burdens for carrying on those same responsibilities." *Warren Trading Post Co.* v. *Arizona Tax Comm'n,* 380 U. S. 685, 690 (1965).

not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply. It follows that Indians and Indian property on an Indian reservation are not subject to State taxation except by virtue of express authority conferred upon the State by act of Congress." U. S. Dept. of the Interior, Federal Indian Law 845 (1958) (hereafter Federal Indian Law).

This is not to say that the Indian sovereignty doctrine, with its concomitant jurisdictional limit on the reach of state law, has remained static during the 141 years since *Worcester* was decided. Not surprisingly, the doctrine has undergone considerable evolution in response to changed circumstances. As noted above, the doctrine has not been rigidly applied in cases where Indians have left the reservation and become assimilated into the general community. See, *e. g., Oklahoma Tax Comm'n* v. *United States,* 319 U. S. 598 (1943). Similarly, notions of Indian sovereignty have been adjusted to take account of the State's legitimate interests in regulating the affairs of non-Indians. See, *e. g., New York ex rel. Ray* v. *Martin,* 326 U. S. 496 (1946); *Draper* v. *United States,* 164 U. S. 240 (1896); *Utah & Northern R. Co.* v. *Fisher,* 116 U. S. 28 (1885). This line of cases was summarized in this Court's landmark decision in *Williams* v. *Lee,* 358 U. S. 217 (1959): "Over the years this Court has modified [the *Worcester* principle] in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized . . . . Thus, suits by Indians against outsiders in state courts have been sanctioned. . . . And state courts have been allowed to try non-Indians who committed crimes against each other on a reservation. . . . But if the crime was by or against an Indian, tribal jurisdiction or that expressly conferred on other courts by Congress has remained exclusive. . . . Essentially, absent governing

Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Id.*, at 219–220 (footnote omitted).

Finally, the trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption.[7]   See *Mescalero Apache Tribe* v. *Jones, ante,* p. 145.   The modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power.   Compare, *e. g., United States* v. *Kagama,* 118 U. S. 375 (1886), with *Kennerly* v. *District Court,* 400 U. S. 423 (1971).[8]

The Indian sovereignty doctrine is relevant, then, not because it provides a definitive resolution of the issues in this suit, but because it provides a backdrop against which the applicable treaties and federal statutes must be read.   It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government.   Indians today are Ameri-

---

[7] The source of federal authority over Indian matters has been the subject of some confusion, but it is now generally recognized that the power derives from federal responsibility for regulating commerce with Indian tribes and for treaty making.   See U. S. Const. Art. I, § 8, cl. 3; Art. II, § 2, cl. 2.   See also *Williams* v. *Lee,* 358 U. S. 217, 219 n. 4 (1959); *Perrin* v. *United States,* 232 U. S. 478, 482 (1914); Federal Indian Law 3.

[8] The extent of federal pre-emption and residual Indian sovereignty in the total absence of federal treaty obligations or legislation is therefore now something of a moot question.   Cf. *Organized Village of Kake* v. *Egan,* 369 U. S. 60, 62 (1962); Federal Indian Law 846. The question is generally of little more than theoretical importance, however, since in almost all cases federal treaties and statutes define the boundaries of federal and state jurisdiction.

can citizens.[9] They have the right to vote,[10] ' to use state courts,[11] and they receive some state services.[12] But it is nonetheless still true, as it was in the last century, that "[t]he relation of the Indian tribes living within the borders of the United States . . . [is] an anomalous one and of a complex character. . . . They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided." *United States* v. *Kagama,* 118 U. S., at 381–382.

## III

When the relevant treaty and statutes are read with this tradition of sovereignty in mind, we think it clear that Arizona has exceeded its lawful authority by attempting to tax appellant. The beginning of our analysis must be with the treaty which the United States Gov-

---

[9] See 8 U. S. C. § 1401 (a) (2).

[10] See, *e. g., Harrison* v. *Laveen,* 67 Ariz. 337, 196 P. 2d 456 (1948).

[11] See, *e. g., Felix* v. *Patrick,* 145 U. S. 317, 332 (1892).

[12] The court below pointed out that Arizona was expending tax monies for education and welfare within the confines of the Navajo Reservation. 14 Ariz. App., at 456–457, 484 P. 2d, at 225–226. It should be noted, however, that the Federal Government defrays 80% of Arizona's ordinary social security payments to reservation Indians, see 25 U. S. C. § 639, and has authorized the expenditure of more than $88 million for rehabilitation programs for Navajos and Hopis living on reservations. See also 25 U. S. C. §§ 13, 309, 309a. Moreover, "[c]onferring rights and privileges on these Indians cannot affect their situation, which can only be changed by treaty stipulation, or a voluntary abandonment of their tribal organization." *The Kansas Indians,* 5 Wall., at 757.

ernment entered with the Navajo Nation in 1868. The agreement provided, in relevant part, that a prescribed reservation would be set aside "for the use and occupation of the Navajo tribe of Indians" and that "no persons except those herein so authorized to do, and except such officers, soldiers, agents, and employés of the government, or of the Indians, as may be authorized to enter upon Indian reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article." 15 Stat. 668.

The treaty nowhere explicitly states that the Navajos were to be free from state law or exempt from state taxes. But the document is not to be read as an ordinary contract agreed upon by parties dealing at arm's length with equal bargaining positions. We have had occasion in the past to describe the circumstances under which the agreement was reached. "At the time this document was signed the Navajos were an exiled people, forced by the United States to live crowded together on a small piece of land on the Pecos River in eastern New Mexico, some 300 miles east of the area they had occupied before the coming of the white man. In return for their promises to keep peace, this treaty 'set apart' for 'their permanent home' a portion of what had been their native country." *Williams* v. *Lee,* 358 U. S., at 221.

It is circumstances such as these which have led this Court in interpreting Indian treaties, to adopt the general rule that "[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith." *Carpenter* v. *Shaw,* 280 U. S. 363, 367 (1930). When this canon of construction is taken together with the tradition of Indian independence described above, it cannot be doubted that the reservation of certain lands for the exclusive use and occupancy of

the Navajos and the exclusion of non-Navajos from the prescribed area was meant to establish the lands as within the exclusive sovereignty of the Navajos under general federal supervision. It is thus unsurprising that this Court has interpreted the Navajo treaty to preclude extension of state law—including state tax law—to Indians on the Navajo Reservation. See *Warren Trading Post Co.* v. *Arizona Tax Comm'n*, 380 U. S., at 687, 690; *Williams* v. *Lee, supra*, at 221–222.

Moreover, since the signing of the Navajo treaty, Congress has consistently acted upon the assumption that the States lacked jurisdiction over Navajos living on the reservation.[13] Thus, when Arizona entered the Union, its entry was expressly conditioned on the promise that the State would "forever disclaim all right and title to . . . all lands lying within said boundaries owned or held by any Indian or Indian tribes, the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States." Arizona Enabling Act, 36 Stat. 569.[14]

Nor is the Arizona Enabling Act silent on the specific question of tax immunity. The Act expressly provides

---

[13] "Congress has . . . acted consistently upon the assumption that the States have no power to regulate the affairs of Indians on a reservation. . . . Significantly, when Congress has wished the States to exercise this power it has expressly granted them the jurisdiction which *Worcester* v. *Georgia* has denied." *Williams* v. *Lee*, 358 U. S., at 220–221 (footnote omitted).

[14] This language is duplicated in Arizona's own constitution. See Ariz. Const., Art. 20, ¶ 4. It is also contained in the Enabling Acts of New Mexico and Utah, the other States in which the Navajo Reservation is located. See New Mexico Enabling Act, 36 Stat. 558–559; Utah Enabling Act, 28 Stat. 108.

that "nothing herein, or in the ordinance herein provided for, shall preclude the said State from taxing as other lands and other property are taxed any lands and other property *outside of an Indian reservation* owned or held by any Indian." *Id.*, at 570 (emphasis added). It is true, of course, that exemptions from tax laws should, as a general rule, be clearly expressed. But we have in the past construed language far more ambiguous than this as providing a tax exemption for Indians. See, *e. g.*, *Squire* v. *Capoeman*, 351 U. S. 1, 6 (1956), and we see no reason to give this language an especially crabbed or restrictive meaning.[15]

Indeed, Congress' intent to maintain the tax-exempt status of reservation Indians is especially clear in light of the Buck Act, 4 U. S. C. § 105 *et seq.*, which provides comprehensive federal guidance for state taxation of those living within federal areas. Section 106 (a) of Title 4 U. S. C. grants to the States general authority to impose an income tax on residents of federal areas, but § 109 expressly provides that "[n]othing in sections 105 and 106 of this title shall be deemed to authorize the levy or collection of any tax on or from any Indian not otherwise taxed." To be sure, the language of the statute itself does not make clear whether the reference to "any Indian not otherwise taxed" was intended to apply to reservation Indians earning their income on the reservation. But the legislative history makes plain that this proviso was

---

[15] There is nothing in *Organized Village of Kake* v. *Egan*, 369 U. S. 60 (1962), to the contrary. In *Egan*, we held that " 'absolute' federal jurisdiction is not invariably exclusive jurisdiction," and that this language in federal legislation did not preclude the exercise of residual state authority. See *id.*, at 68. But that holding came in the context of a decision concerning the fishing rights of *nonreservation* Indians. See *id.*, at 62. It did not purport to provide guidelines for the exercise of state authority in areas set aside by treaty for the exclusive use and control of Indians.

meant to except reservation Indians from coverage of the Buck Act, see S. Rep. No. 1625, 76th Cong., 3d Sess., 2, 4 (1940); 84 Cong. Rec. 10685, and this Court has so interpreted it. See *Warren Trading Post Co.* v. *Arizona Tax Comm'n*, 380 U. S., at 691 n. 18. While the Buck Act itself cannot be read as an affirmative grant of tax-exempt status to reservation Indians, it should be obvious that Congress would not have jealously protected the immunity of reservation Indians from state income taxes had it thought that the States had residual power to impose such taxes in any event. Similarly, narrower statutes authorizing States to assert tax jurisdiction over reservations in special situations are explicable only if Congress assumed that the States lacked the power to impose the taxes without special authorization.[16]

Finally, it should be noted that Congress has now provided a method whereby States may assume jurisdiction over reservation Indians. Title 25 U. S. C. § 1322 (a) grants the consent of the United States to States wishing to assume criminal and civil jurisdiction over reservation Indians, and 25 U. S. C. § 1324 confers upon the States the right to disregard enabling acts which limit their authority over such Indians. But the Act expressly provides that the State must act "with the consent of the tribe occupying the particular Indian country," 25 U. S. C. § 1322 (a),[17] and must "appropriately [amend

---

[16] See, *e. g.*, 25 U. S. C. § 398 (congressional authorization for States to tax mineral production on unallotted tribal lands). Cf. 18 U. S. C. § 1161 (state liquor laws may be applicable within reservations); 25 U. S. C. § 231 (state health and education laws may be applicable within reservations).

[17] As passed in 1953, Pub. L. 280, 67 Stat. 588, delegated civil and criminal jurisdiction over Indian reservations to certain States, although not to Arizona. 18 U. S. C. § 1162; 28 U. S. C. § 1360. The original Act also provided a means whereby other States could assume jurisdiction over Indian reservations without the consent of

its] constitution or statutes." 25 U. S. C. § 1324. Once again, the Act cannot be read as expressly conferring tax immunity upon Indians. But we cannot believe that Congress would have required the consent of the Indians affected and the amendment of those state constitutions which prohibit the assumption of jurisdiction if the States were free to accomplish the same goal unilaterally by simple legislative enactment. See *Kennerly* v. *District Court,* 400 U. S. 423 (1971).[18]

Arizona, of course, has neither amended its constitution to permit taxation of the Navajos nor secured the consent of the Indians affected. Indeed, a startling aspect of this case is that appellee apparently concedes that, in the absence of compliance with 25 U. S. C. § 1322 (a), the Arizona courts can exercise neither civil nor criminal jurisdiction over reservation Indians. See Brief for Appellee 24–26.[19] But the appellee nowhere explains how, without such jurisdiction, the State's tax may either be imposed or collected. Cf. Tr. of Oral Arg. 38–39. Unless the State is willing to defend the position

---

the tribe affected. 67 Stat. 590. However, in 1968, Congress passed the Indian Civil Rights Act which changed the prior procedure to require the consent of the Indians involved before a State was permitted to assume jurisdiction. 25 U. S. C. § 1322 (a). Thus, had it wished to do so, Arizona could have unilaterally assumed jurisdiction over its portion of the Navajo Reservation at any point during the 15 years between 1953 and 1968. But although the State did pass narrow legislation purporting to require the enforcement of air and water pollution standards within reservations, Ariz. Rev. Stat. Ann. §§ 36–1801, 36–1865 (Supp. 1972), it declined to assume full responsibility for the Indians during the period when it had the opportunity to do so.

[18] We do not suggest that Arizona would necessarily be empowered to impose this tax had it followed the procedures outlined in 25 U. S. C. § 1322 *et seq.* Cf. 25 U. S. C. § 1322 (b). That question is not presently before us, and we express no views on it.

[19] In light of our prior cases, appellee has no choice but to make this concession. See, *e. g., Kennerly* v. *District Court,* 400 U. S. 423 (1971); *States* v. *Kagama,* 118 U. S. 375 (1886).

that it may constitutionally administer its tax system altogether without judicial intervention, cf. *Ward* v. *Board of County Comm'rs,* 253 U. S. 17 (1920), the admitted absence of either civil or criminal jurisdiction would seem to dispose of the case.

## IV

When Arizona's contentions are measured against these statutory imperatives, they are simply untenable. The State relies primarily upon language in *Williams* v. *Lee* stating that the test for determining the validity of state action is "whether [it] infringed on the right of reservation Indians to make their own laws and be ruled by them." 358 U. S., at 220. Since Arizona has attempted to tax individual Indians and not the tribe or reservation as such, it argues that it has not infringed on Indian rights of self-government.

In fact, we are far from convinced that when a State imposes taxes upon reservation members without their consent, its action can be reconciled with tribal self-determination. But even if the State's premise were accepted, we reject the suggestion that the *Williams* test was meant to apply in this situation. It must be remembered that cases applying the *Williams* test have dealt principally with situations involving non-Indians. See also *Organized Village of Kake* v. *Egan,* 369 U. S., at 75–76. In these situations, both the tribe and the State could fairly claim an interest in asserting their respective jurisdictions. The *Williams* test was designed to resolve this conflict by providing that the State could protect its interest up to the point where tribal self-government would be affected.

The problem posed by this case is completely different. Since appellant is an Indian and since her income is derived wholly from reservation sources, her activity is totally within the sphere which the relevant treaty and

statutes leave for the Federal Government and for the Indians themselves. Appellee cites us to no cases holding that this legislation may be ignored simply because tribal self-government has not been infringed.[20] On the contrary, this Court expressly rejected such a position only two years ago.[21] In *Kennerly* v. *District Court,* 400 U. S. 423 (1971), the Blackfoot Indian Tribe had voted to make state jurisdiction concurrent within the reservation. Although the State had not complied with the procedural prerequisites for the assumption of jurisdiction, it argued that it was nonetheless entitled to extend its laws to the reservation since such action was obviously consistent with the wishes of the Tribe and, therefore, with tribal self-government. But we held that the *Williams* rule was inapplicable and that "[t]he unilateral action of the Tribal Council was insufficient to vest Montana with jurisdiction." *Id.,* at 427. If Montana may not assume jurisdiction over the Blackfeet by simple legislation even when the Tribe itself agrees to be bound by state law, it surely follows that Arizona may not assume such jurisdiction in the absence of tribal agreement.

Nor is the State's attempted distinction between taxes on land and on income availing. Indeed, it is somewhat surprising that the State adheres to this distinction in light of our decision in *Warren Trading Post Co.* v. *Arizona Tax Comm'n, supra,* wherein we invalidated an *income* tax which Arizona had attempted to impose

---

[20] *Organized Village of Kake* v. *Egan,* 369 U. S. 60 (1962), is not such a case. See n. 15, *supra.*

[21] Indeed, the position was expressly rejected in *Williams* itself, upon which appellee so heavily relies. *Williams* held that *"absent governing Acts of Congress,* the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." 358 U. S., at 220 (emphasis added).

within the Navajo Reservation. However relevant the land-income distinction may be in other contexts, it is plainly irrelevant when, as here, the tax is resisted because the State is totally lacking in jurisdiction over both the people and the lands it seeks to tax. In such a situation, the State has no more jurisdiction to reach income generated on reservation lands than to tax the land itself.

Finally, we cannot accept the notion that it is irrelevant "whether the . . . state income tax infringes on [appellant's] rights as an individual Navajo Indian," as the State Court of Appeals maintained. 14 Ariz. App., at 454, 484 P. 2d, at 223. To be sure, when Congress has legislated on Indian matters, it has, most often, dealt with the tribes as collective entities. But those entities are, after all, composed of individual Indians, and the legislation confers individual rights. This Court has therefore held that "the question has always been whether the state action infringed on the right of *reservation Indians* to make their own laws and be ruled by them." *Williams* v. *Lee, supra,* at 220 (emphasis added). In this case, appellant's rights as a reservation Indian were violated when the state collected a tax from her which it had no jurisdiction to impose. Accordingly, the judgment of the court below must be

*Reversed.*