VIRGINIA B. HART, Chairman Department of Industry, Labor andHuman Relations
You requested my opinion concerning the applicability of the Wisconsin Administrative Code to the construction of a building on land held in trust by the United States for the Wisconsin Oneida Indian Tribe. I understand the building will be leased to the United States Postal Service for use as a post office.
For the following reasons, it is my opinion that the Wisconsin Administrative Code is not enforceable as to buildings constructed on land held in trust by the United States for the Oneida Tribe or on tribally owned land within the reservation.
The policy of leaving Indian people and Indian land free from state jurisdiction and control is deeply rooted in the nation's history. See McClanahan v. Arizona State Tax Commission (1973),411 U.S. 164, 168, 93 S.Ct. 1257, 36 L.Ed. 129. This policy is derived from tribes' historical status as independent sovereign nations. Although tribes have lost external sovereignty, the United States Supreme Court has always recognized that Indian tribes are "distinct political communities having territorial boundaries within which their authority is exclusive." Worcesterv. The State of Georgia, 6 Pet. 515, 8 L.Ed. 483 (1832).
Although the concept of internal tribal sovereignty has undergone considerable change in the years since Worcester,supra, it is, nevertheless, clear that certain basic legal principles are still applicable where questions of state jurisdiction over Indian people *Page 277 
or Indian land within the exterior boundaries of a reservation arise. First, a federally recognized Indian tribe is a legitimate governmental entity possessing attributes of sovereignty over both its members and its territory, and as such has the power to regulate its internal and social relations. Second, state law can have no role to play within the reservation boundaries except with the consent of the tribe itself or in conformity with treaties and acts of Congress or where the courts have determined that state law shall apply. See 64 OAG 124 (1975); United Statesv. Mazurie (1975), 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706;Iron Crow v. Oglala Sioux Tribe of Pine Ridge Res. (8th Cir. 1956), 231 F.2d 89.
The Oneida Tribe is federally recognized as a governmental entity in both treaties with the United States and in federal legislation. The tribe was a party to the Six Nations Memorial to the President of 1810 and approved the Menominee Treaty of 1831 (7 Stat. 342). The Oneida Tribe was also party to a number of treaties with the United States which established and later modified the present Oneida Reservation near the City of Green Bay.
The Menominee Treaty of 1831, supra, set aside approximately five hundred thousand acres as a future home for the various New York tribes including the Oneida. Most but not all of that land was ceded to the United States by the Treaty of January 15, 1838, with the New York Indians (7 Stat. 550), in return for one million eight hundred twenty-four thousand acres of land directly west of the State of Missouri. At about the same time in the Treaty of February 3, 1838 (7 Stat. 566), the Oneida ceded all their remaining land near Green Bay, Wisconsin, to the United States except that reserved in Article 2, which provides:
 "From the foregoing cession there shall be reserved to the said Indians to be held as other Indian lands are held a tract of land containing one hundred (100) acres, for each individual, and the lines of which shall be so run as to include all their settlements and improvements in the vicinity of Green Bay." (Emphasis added.)
The courts have considered treaty language similar to that quoted above, in view of internal tribal sovereignty, to mean that state jurisdiction does not extend to tribal land and tribal members *Page 278 
unless specifically authorized by federal legislation. See, e.g.,McClanahan, supra; Mescalero Apache Tribe v. Jones, supra. See also The Kansas Indians (1866), 5 Wall 737 and The New YorkIndians (1866), 5 Wall 761.
The Oneida Tribe is also organized under the Indian Reorganization Act of June 18, 1934 (48 Stat. 984, 25 U.S.C. sec. 46
1478), and has adopted a constitution and bylaws pursuant thereto which set forth the basic organization for the exercise of tribal governmental power (25 U.S.C. sec. 476). Thus organized, the tribe secured a corporate charter from the federal government for the purpose of engaging in business activities (25 U.S.C. sec. 477). Both the corporate charter and the constitution and bylaws were approved by the Secretary of the Interior.
The Oneida Tribe thus has the same rights of self-government as do other federally recognized tribes. The question, therefore, is whether Congress has limited the Oneida Tribe's right to exclusively regulate land use within the reservation by conferring such jurisdiction upon the State of Wisconsin.
The courts now resolve jurisdictional questions involving the application of state law to Indian persons and Indian land by reading applicable treaties and federal statutes against the backdrop of tribal sovereignty. See 64 OAG 124 (1975);McClanahan, supra; Mescalero Apache Tribe v. Jones (1973),411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114; Williams v. Lee (1959),358 U.S. 217, 79 S.Ct. 269. 3 L.Ed.2d 251. With these considerations in mind, it is necessary to determine whether P.L. 280 (67 Stat. 588, 28 U.S.C. sec. 1360 and 18 U.S.C. sec. 1162) granted the state authority to extend its general civil laws, such as the State Administrative Code, to Indian trust land within the Oneida Reservation.
58 OAG 91 (1969) expressed the opinion that Public Law 280 provided specific congressional authorization to Wisconsin to apply local zoning laws to land held in trust by the United States for the Winnebago Tribe. The provisions of P.L. 280 (28 U.S.C. sec. 1360 (a) and (b)), under consideration there, state:
 "`(a) Each of the States or Territories listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name *Page 279 
of the State or Territory to the same extent that such State or Territory has jurisdiction over other civil causes of action, and those civil laws of such State or Territory that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:
"`* * *
 "`(b) Nothing in this section shall authorize the alienation, encumberance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; . . .'"
For the companion statute dealing with criminal jurisdiction, see 18 U.S.C. sec. 1162.
Subsequent to 58 OAG 91 (1969), it was held in Santa Rosa Bandof Indians v. Kings County (9th Cir. 1975), 532 F.2d 655, that Kings County, California, was without jurisdiction to enforce its zoning ordinance or building code on Indian reservation trust lands. (See also United States v. County of Humboldt (N.D. Calif. 1976). The court in Santa Rosa rejected for a number of alternative reasons, the state's argument that P.L. 280 was authorization for the exercise of such jurisdiction. Significant to our analysis is the court's discussion of 28 U.S.C. sec. 1360
(b), supra, which expressly disclaims authorizing state "encumbrance or taxation of any real . . . property . . . held in trust by the United States." The court observed at 667 that:
 ". . . The word `encumbrance' [as used in P.L. 280] is of course ambiguous, and courts have split on whether or not it evidences an intent to exempt trust lands from state zoning and land use regulations. Compare Snohomish County v. Seattle Disposal Co., 70 Wash. 2d 668, 425 P.2d 22 (1967), cert. denied, 389 U.S. 1016, 88 S.Ct. 585, 19 L.Ed.2d 662 (1967) (Douglas and White JJ., dissenting), with Rincon Band of Mission Indians v. County of San Diego [S.D. Cal. 1971], 324 F. Supp. 371, rev'd on other grounds (9th Cir. *Page 280 
1974), 495 F.2d 1], and Aqua Caliente Band of Mission Indians' Tribal Council v. City of Palm Springs, 347 F. Supp. 42 (C.D. Cal. 1972), vacated and remanded by this court in an unpublished order, January 24, 1975 . . . . Relying on the canon of construction applied in favor of Indians, the Court has ruled in different contexts that the word `encumbrance' is to be broadly construed and is not limited to a burden which hinders alienation of the fee, see Squire v. Capoeman [(1956), 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883], United States v. Rickert [(1903), 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532]; Kirkwood v. Arenas, 243 F.2d 863 (9th Cir. 1957), rather focussing on the effect the challenged state action would have on the value, use and enjoyment of the land. See Hastings L.J., at 1498-1499. Compare the majority and dissenting opinions in Snohomish, supra. Following the Court's lead, and resolving, as we must, doubts in favor of the Indians, we think that the word as used here may reasonably be interpreted to deny the state the power to apply zoning regulations to trust property."
The court also held at 658 that many concurrent jurisdiction the states might inherently have possessed to regulate Indian use of reservation lands has long ago been preempted by extensive federal policy and legislation." In support, the court cited numerous cases and 25 C.F.R. sec. 1.4 (a), which provides in relevant part as follows:
 ". . . none of the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property, including water rights, shall be applicable to any such property leased from or held or used under agreement with and belonging to any Indian or Indian tribe, band, or community that is held in trust by the United States . . . ."
 In Bryan v. Itasca County (1976), 96 S.Ct. 2102,48 L.Ed.2d 710, Justice Brennan for a unanimous court in effect confirmed the analysis of P.L. 280's legislative history in Santa Rosa Band v.Kings County, supra. The court, however, held that 28 U.S.C. sec. 1360
(a), the section of P.L. 280 that many states have relied upon as authority for extending their general civil laws to Indian persons and Indian land within reservations, was not intended by Congress to confer such authority. The court reasoned that sec. (a): *Page 281 
 ". . . seems to have been primarily intended to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens, by permitting the courts of the states to decide such disputes . . . ." 96 S.Ct. 2109.
The court went on to observe that "this construction finds support in the consistent and uncontradicted references in the legislative history to `permitting' `State courts to adjudicate
civil controversies' arising on Indian reservations, H.R. Rep. No. 848, at 5, 6, U.S. Code Cong. Admin. News 1953, p. 2411 (emphasis added), and the absence of anything remotely resembling an intention to confer general state civil regulatory control over Indian reservations." 96 S.Ct. 2109.
Bryan concerned the question reserved in McClanahan, supra: whether the grant of civil jurisdiction to the states conferred by sec. 4 of P.L. 280 (28 U.S.C. sec. 1360 (a)), is a congressional grant of power to the states to tax reservation Indians. In answering no, the court concluded without qualification that P.L. 280 does not confer general state regulatory control over Indian reservations. At 96 S.Ct. 2111, the court stated:
 ". . . nothing in its legislative history remotely suggests that Congress meant the Act's extension of civil jurisdiction to the States should result in the undermining or destruction of such tribal governments as did exist and a conversion of the affected tribes into little more than `private, voluntary organizations,' United States v. Mazurie
(1975), 419 U.S. 544, 557, 95 S.Ct. 710, 718, 42 L.Ed. 2d 706 — a possible result if tribal governments and reservation Indians were subordinated to the full panoply of civil regulatory powers, including taxation, of state and local governments." (Citing with approval in f.n. 14, Santa Rosa Band of Indians v. Kings County, supra.)
In summary, Santa Rosa Band, supra, held that county zoning laws constitute an "encumbrance" upon Indian land as that word is defined under federal law and such zoning laws are, therefore, invalid under 28 U.S.C. sec. 1360 (b). Bryan on the other hand held that 28 U.S.C. sec. 1360 (a) is not authority for a state to enforce its general civil regulatory laws upon Indian persons or Indian land located within reservation boundaries. *Page 282 
The opinion expressed in 58 OAG 91 (1969) cannot be reconciled with the construction placed upon P.L. 280 by the United States Supreme Court in Bryan. It is, therefore, withdrawn. Based on the United States Supreme Court's analysis in Bryanr, and in view of the Oneida Tribe's internal sovereignty, it is my opinion that the state does not have jurisdiction to require the application of the Wisconsin Administrative Code to the construction of buildings on Oneida Reservation trust land.
This is not to say that buildings constructed on land held in trust for the Oneida Tribe will be constructed without consideration of basic safety standards and other building code regulations. On construction projects that do not come under applicable federal building regulations, the usual practice is to adopt the state building code. This was done with the Oneida post office building in the construction contract. By adopting state building codes, those persons involved with the construction and use of the building are assured that the building meets minimum safety standards. It should also be kept in mind that disregard of the state building code could affect liability if members of the public are injured while using such buildings. In AmericanExch. Bank of Madison, Wis. v. United States (1958), 257 F.2d 938, 79 ALR 2d 879, the court held that the federal government would be liable for injuries under the Federal Tort Claims Act to a person who fell on the steps of the Madison post office where the lack of a handrail violated the standard of care established by the state building code. Disregard of code requirements could be costly if they are not observed. In private litigation, violation of the code is negligence per se.
BCL:JDN