KEVIN J. KELLEY, District Attorney Forest County
You ask whether the Sokaogon (Mole Lake) Indian Tribe must secure a liquor license from the Town of Nashville in order to sell alcoholic beverages on the Mole Lake Indian Reservation during its annual Bluegrass Festival. For the following reasons it is my opinion that the Tribe need not secure a state license.
As I have indicated in previous opinions (see., e.g., 65 Op. Att'y Gen. 276 (1976); 64 Op. Att'y Gen. 184 (1975)), there are certain basic legal principles which govern the resolution of jurisdictional questions concerning Indians and Indian lands. First, a federally recognized Indian tribe such as the Mole Lake Tribe is a legitimate governmental *Page 184 
entity possessing attributes of sovereignty over both its members and its territory, and as such has the power to regulate its internal and social relations. Second, the federal government has authority to qualify this power. Third, state law can have no role to play within a reservation's boundaries except with the consent of the tribe itself or in conformity with treaties and acts of Congress or where the courts have determined that state law shall apply.
The Sokaogon Chippewa Tribe is a federally recognized Indian tribe. AS such, it possesses the power to regulate its internal relations to the extent this power has not been qualified by federal law or affected by the unique relationship between Indian tribes and the United States. One aspect of its internal sovereignty which has been qualified by the federal government is the power to regulate liquor transactions within the exterior boundaries of its reservation. Congress qualified that power pursuant to its authority to regulate commerce with Indian tribes (U.S. Const. art. 1, sec. 8), and completely preempted the field of liquor transactions involving Indians and "Indian country" by enacting a series of federal Indian liquor laws (codified at18 U.S.C. secs. 1154, 1156. 3113, 3488 and 3618) which prohibit the introduction, possession or sale of alcoholic beverages within "Indian country," or to Indians anywhere. See United States v.Mazurie, 419 U.S. 544 (1975). See also Perrin v. United States,232 U.S. 478 (1914).
In 1953, by enacting Pub.L. NO. 83-277, 18 U.S.C. sec. 1161
("Pub.L. NO. 277"), Congress made the federal Indian liquor laws inapplicable to:
 [A]ny act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register. Added Aug. 15, 1953, C. 502, sec. 2, 67 Stat. 586.
In enacting this law, Congress did not delegate, nor did it intend to delegate, any regulatory authority to the states. Rather, Congress merely required that state law be used as a guide or standard of measurement for determining what acts or transactions may be legalized within Indian country by tribal ordinance. E.P.A. v. Cal. ex rel. *Page 185 Water Res. Control Bd., 426 U.S. 200 (1976), makes the point very clear that Congress can require federal entities to adhere to state substantive law without giving states the actual authority to issue, revoke, and enforce permits. Id. at 209-28. The policy of state laws regarding matters such as hours for sale of liquor and legal age limits for sale must be followed. An offender of such state laws would be subject to prosecution for violation of the federal Indian liquor laws because the act or transaction would not be in the language of Pub.L. NO. 277, "in conformity . . . with the laws of the State." However, as will be shown, the phrase "in conformity with the laws of the State," as used in Pub.L. No. 277, was not meant to include regulatory laws such as a liquor licensing requirement.
Before beginning this analysis, it should first be noted that Pub.L. No. 277 rendered the federal Indian liquor laws inapplicable to those legally conforming acts or transactions taking place "within any area of Indian country" (emphasis supplied). Unquestionably, the matter at issue concerns an act or transaction occurring within Indian country. 18 U.S.C. sec. 1151
defines "Indian country":
 Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same. June 25, 1948, C. 645, 62 Stat. 757: May 24, 1949, C. 139, sec. 25, 63 Stat. 94.
18 U.S.C. secs. 1154 (c) and 1156 qualify the sec. 1151 definition, for purposes of the Indian liquor laws, by excluding "fee-patented lands in non-Indian communities or rights-of-way through Indian reservations . . . in the absence of a treaty or statute extending the Indian liquor laws thereto. June 25, 1948, C. 645. 62 Stat. 758; May 24, 1949, C. 139, sec. 27,63 Stat. 94." *Page 186 
In Mazurie, the Court noted that "Indian country," as used in Pub.L. No. 277, includes the sec. 1154 (c) exception, but that this exception "is available for fee-patented lands which are innon-Indian communities, rather than for those which are not inIndian communities." Mazurie, 419 U.S. at 552 n. 10. Thus, fee-patented land within reservation boundaries is "Indian country" under 18 U.S.C. sec. 1161 unless it is located in an identifiablenon-Indian community.
There are no non-Indian communities within the Mole Lake Reservation. The entire reservation is "Indian country" within the above mentioned meaning of that term and is under the jurisdiction of the Sokaogon Chippewa Tribe as it relates to liquor. On April 28, 1977, the Tribe adopted an ordinance repealing prohibition and authorizing the Tribe, or individuals licensed by the Tribe, to sell alcoholic beverages within the reservation in conformity with state law. (Ordinance No. 4-28A-77, approved by the Secretary of the Interior and published in the Federal Register on July 29, 1977 [42 Fed. Reg. 38653])
Both Pub.L. No. 277 and tribal Ordinance No. 4-28A-77 require liquor transactions within the reservation to conform with state law. Nevertheless, neither the federal law nor the tribal ordinance expressly confers any jurisdiction on the State of Wisconsin to impose its liquor laws on the Tribe or to enforce them within reservation boundaries. There is ample authority which supports this proposition of tribal independence from a regulatory law such as a liquor licensing requirement by the state.
In United States v. State of New Mexico, 590 F.2d 323 (10th Cir. 1978), cert. denied, 100 S.Ct. 63 (1979), the court concluded that the State of New Mexico did not acquire jurisdiction under 18 U.S.C. sec. 1161 to enforce her liquor laws on the Mescalero Apache Reservation. Noting federal preemption in this subject area, the court adhered to the requirement that delegation of authority to a state be effected through unequivocal language. See Bryan v. Itasca Cty., Minnesota,426 U.S. 373 (1976); Moe v. Confederated Salish Khootenai Tribes,Etc., 425 U.S. 463 (1976); McClanahan v. State Tax Commission ofArizona, 411 U.S. 164 (1973); and Warren Trad. Post Co. v.Arizona State Tax Com'n, 380 U.S. 685 (1965).18 U.S.C. sec. 1161, the court held, does not delegate this authority to the states either expressly or impliedly. 590 F.2d at 328. See also *Page 187 Muckleshoot Indian Tribe v. State of Washington, et al., No. C78-783V (W.D. Wash., March 9, 1979).
To date, Mazurie is the only United States Supreme Court case dealing with Pub.L. No. 277. In Mazurie, the Supreme Court unanimously affirmed Congress' authority to delegate to individual Indian tribes a part of its plenary power to regulate liquor transactions within Indian country. Although the question of state regulation was not considered, there was no doubt or exception expressed concerning the authority of Congress to delegate regulatory authority over liquor transactions to the Tribe. The issue in Mazurie was whether the Tribe could imposetribal licensing requirements on non-Indians. The Court, in holding that the Tribe was so empowered by Pub.L. No. 277, found significant the Tribe's independent governmental status. Justice Rehnquist, writing for a unanimous Court stated:
 Thus it is an important aspect of this case that Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory, Worcester v. Georgia, 6 Pet 515, 557, 8 L.Ed 483 (1832); they are "a separate people" possessing "the power of regulating their internal and social relations . . .," United States v. Kagama, 118 U.S. 375, 381-382, 30 L.Ed 228, 6 S.Ct. 1109 (1886); McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 173. 36 L.Ed.2d 129, 93 S.Ct. 1257 (1973).
 Cases such as Worcester, supra, and Kagama, supra, . . . make clear that when Congress delegated its authority to control the introduction of alcoholic beverages into Indian country, it did so to entities which possess a certain degree of independent authority over matters that affect the internal and social relations of tribal life. Clearly the distribution and use of intoxicants is just such a matter.
419 U.S. at 557. The Court in Mazurie also referred to Pub.L. No. 277 as "local-option legislation allowing Indian tribes, with approval of the Secretary of the Interior, to regulate the introduction of liquor into Indian country, so long as state law is not violated." 419 U.S. at 547. This right of the Tribe to determine what, if any, liquor transactions are to be allowed within the areas of Indian country under its jurisdiction would be meaningless if a state could require that such tribe first be issued a state liquor license. *Page 188 
Based on the authority cited, the reasoning provided in this analysis, and on the fact that "present federal policy appears to be returning to a focus upon strengthening tribal self-government" (Bryan, 426 U.S. at 388 n. 14), it is my opinion that Pub.L. No. 277 does not confer on the state or its subsidiary governments any jurisdictional authority with regard to the regulation of alcoholic beverages within "Indian country." The Supreme Court has neither expressed nor implied any other construction of the statute. Accordingly, I interpret the phrase "in conformity . . . with the laws of the state" (18 U.S.C. sec. 1161) to mean that the Tribe must exercise its regulatory authority in a manner consistent with the public policy of the state as reflected in state liquor laws; not that the state may impose its regulatory authority on the Tribe.
An alternative argument might be made that Pub.L. No. 83-280
("Pub.L. No. 280") conferred jurisdiction on the states to regulate liquor transactions within Indian country.
Pub.L. No. 280 (Act of Aug. 15, 1953, 67 Stat. 588, codified at 18 U.S.C. § 1162 and 28 U.S.C. sec. 1360) provides, interalia, that Wisconsin's criminal and civil laws of general application shall apply within the areas of Indian country located within the state, subject to certain exceptions and qualifications, and that the state shall have jurisdiction over criminal and civil causes of action arising within such areas.
It is my opinion that this legislation does not confer jurisdiction on the states which would allow states to require Indians within Indian country to secure a state-issued liquor license before alcoholic beverages could be sold within that Indian country. An analysis of case law, the legislative history of Pub.L. No. 280, and current federal Indian policy regarding jurisdictional issues between states and tribal Indians in Indian country clearly supports this opinion.
As a first step, it should be understood that "[t]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history." Rice v. Olson, 324 U.S. 786,789 (1945). This fundamental policy is a response to the unique relationship between the federal government and the Indian people, "who are the wards of the nation, dependent upon its protection and good faith." Carpenter v. Shaw, 280 U.S. 363, 367
(1930). The policy of supporting the right of tribal self-government goes hand-in-hand with the policy of *Page 189 
leaving Indians free from state jurisdiction and control. InWilliams v. Lee, 358 U.S. 217 (1959), the United States Supreme Court underscored "the right of [Indian nations] to make their own laws and be ruled by them," 358 U.S. at 220. This right was emphatically reaffirmed in United States v. Wheeler, 435 U.S. 313,322-30 (1978). The Indian sovereignty doctrine has not, however, remained absolute. Notions of Indian sovereignty have been adjusted to take account of the state's legitimate interests "in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized." Williams,358 U.S. at 219. But, the states may not encroach upon an Indian nation s internal self-government until Congress has unequivocally sanctioned their presence within a reservation. SeeWheeler, 435 U.S. at 323; McClanahan, 411 U.S. at 168-69, 172-73. Such unequivocal sanction was not granted by Congress in Pub.L. No. 280.
A most instructive case illustrating the limitations of state jurisdiction over Indian matters is Bryan. In that case, the United States Supreme Court held that the state does not have authority to impose a personal property tax on a mobile home located on the Leech Lake Indian Reservation in Minnesota. In discussing the meaning of Pub.L. No. 280, the Court maintained that the congressional grant of jurisdiction to the states through Pub.L. No. 280 was not authorization to the states to subordinate reservation Indians "to the full panoply of civil regulatory powers, including taxation, of state and local governments" because Congress did not clearly express such an intent. Bryan, 426 U.S. at 388. In writing the opinion for a unanimous Court Justice Brennan stated:
 Congress knew well how to express its intent directly when that intent was to subject reservation Indians to the full sweep of state laws. . . . [I]f Congress in enacting Pub L 280 had intended to confer upon the States general civil regulatory powers . . . over reservation Indians, it would have expressly said so.
Id. at 389-90. He concluded that:
 What we recently said of a claim that Congress had terminated an Indian reservation by means of an ambiguous statute is equally applicable here. . .:
 "Congress was fully aware of the means by which termination could be effected. But clear termination language was not *Page 190 
employed in the . . . Act. This being so, we are not inclined to infer an intent to terminate. . . . A congressional determination to terminate must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history."
Id. at 392-93 (quoting Mattz v. Arnett, 412 U.S. 481, 504-05
(1973))
Thus, the Supreme Court refused to construe Pub.L. No. 280 as conferring any civil regulatory jurisdiction upon the states by implication.
Likewise, Congress knew how to express its intent directly when that intent was to make federal laws inapplicable to the Pub.L. No. 280 states. As evidence of this, Congress expressly made two federal statutes (the General Crimes Act, 18 U.S.C. sec. 1152 and the Major Crimes Act, 18 U.S.C. sec. 1153) inapplicable within the areas of Indian country affected by Pub.L. No. 280. See18 U.S.C. sec. 1162 (C). None of the federal Indian liquor laws, however, are expressly made inapplicable. It is therefore reasonable to assume that if, in enacting Pub.L. No. 280, Congress had intended to make any federal Indian liquor laws inapplicable within Indian country, it would have expressly said so. It is thus clear that Congress did not intend to repeal continued federal preemption in the area of liquor transactions affecting Indians or Indian country, and that the federal Indian liquor laws were intended to remain in full force and effect in all areas of Indian country, including those affected by Pub.L. No. 280. The legislative history of Pub.L. No. 280 indicates that Congress intentionally excluded the Indian liquor laws from the list of federal laws which would be affected by the proposed legislation, choosing instead to deal with these laws in separate legislation (Pub.L. No. 277) applicable to the entire country.See 99 Cong. Rec. 10783-84 (1953) (statement of Senator Barrett).
In concluding without qualification that Pub.L. No. 280 does not confer general state regulatory control over Indian reservations, the Bryan Court, 426 U.S. at 388 stated: "[N]othing in its legislative history remotely suggests that Congress meant the Act's extension of civil jurisdiction to the States should result in the undermining or destruction of such tribal governments." (Citing Mazurie, 419 U.S. at 557). *Page 191 
The overriding principle to be derived from this is that state jurisdiction must not interfere with Indian self-government, absent some compelling state interest. Requiring an Indian tribe to secure a state liquor license in order to sell alcoholic beverages within its own Indian country would interfere with Indian self-government and constitute an undermining of the authority of the tribal government. There exists no state interest compelling enough to outweigh the integrity of tribal self-government in this instance.
There is yet another indication from legislative history as evidence that Indian tribes were intended by Congress to be free from such regulatory constraints as state liquor licenses. The Court in Bryan stated that:
 The primary concern of Congress in enacting Pub L 280 that emerges from its sparse legislative history was with the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement. See Goldberg, Public Law 280: The Limits of State Jurisdiction over Reservation Indians, 22 UCLA L Rev 535, 541-542 (1975). The House Report states:
 "These States lack jurisdiction to prosecute Indians for most offenses committed on Indian reservations or other Indian country, with limited exceptions. The applicability of Federal criminal laws in States having Indian reservations is also limited. The United States district courts have a measure of jurisdiction over offenses committed on Indian reservations or other Indian country by or against Indians, but in cases of offenses committed by Indians against Indians that jurisdiction is limited to the so-called 10 major crimes: murder, manslaughter, rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery, and larceny.
 "As a practical matter, the enforcement of law and order among the Indians in the Indian country has been left largely to the Indian groups themselves. In many States, tribes are not adequately organized to perform that function; consequently, there has been created a hiatus in law-enforcement authority that could best be remedied by conferring criminal jurisdiction on States indicating an ability and willingness to accept such responsibility." H R Rep No. 848, 83d Cong, 1st Sess, 5-6 *Page 192 
(1953) [U.S. Code Cong. Admin. News 1953, at 2409, 2411-12].
 Thus, provision for state criminal jurisdiction over offenses committed by or against Indians on the reservations was the central focus of Pub L 280 and is embodied in sec. 2 of the Act, 18 U.S.C. § 1162.
 In marked contrast in the legislative history is the virtual absence of expression of congressional policy or intent respecting sec. 4's grant of civil jurisdiction to the States. Of special significance for our purposes, however, is the total absence of mention or discussion regarding a congressional intent to confer upon the States an authority to tax Indians or Indian property on reservations. Neither the Committee Reports nor the floor discussion in either House mentions such authority. This omission has significance in the application of the canons of construction applicable to statutes affecting Indian immunities, as some mention would normally be expected if such a sweeping change in the status of tribal government and reservation Indians had been contemplated by Congress.
426 U.S. at 379-81 (emphasis added: footnotes omitted).
Wisconsin's liquor licensing laws are basically regulatory in nature (although criminal penalties may be imposed for some violations ) and thus, under the Court's reasoning in Bryan, do not apply to Indian tribes. Licenses are granted or denied at the option of local municipalities and liquor transactions are locally regulated, subject to statutory guidelines. See secs. 66.054 (5) and 176.05 (1), Stats. This type of local option to authorize and regulate liquor transactions subject to state statutory guidelines, is precisely what Congress delegated to the tribes on reservations, in Pub.L. No. 277. See Mazurie,419 U.S. at 557. Pub.L. No. 280 clearly does not affect the applicability of Pub.L. No. 277, nor does it extend the liquor licensing authority of municipalities to reservation Indians.
The final step of this analysis reveals that the current federal Indian policy recognizing and encouraging the right of tribal self-government supports the opinion that a state liquor license is not required by Indians in Indian country. The federal government has long been recognized to hold, along with its plenary power to regulate Indian affairs, a trust status towards the Indian — a status accompanied *Page 193 
by fiduciary obligations. See Seminole Nation v. United States,316 U.S. 286,297 (1942); United States v. Kagama, 118 U.S. 375
(1886); Beecher v. Wetherby, 95 U.S. 517, 525 (1877). Just one manifestation of this special status is the policy that "statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians." Alaska Pacific Fisheries v. United States,248 U.S. 78, 89 (1918). See Antoine v. Washington, 420 U.S. 194,199-200 (1975). This principle of statutory construction has particular force in examining and interpreting statutes such as those discussed in this opinion.
The federal position with regard to the liquor licensing requirement for Indians is quite clear. In response to a request by the Bureau of Indian Affairs for comments about the Solicitor's 1971 Opinion regarding this very issue, the Department of Justice stated that it would not prosecute Indians for selling liquor in conformity with state law and tribal regulations, but without a state liquor license. Solicitor's Opinion, January 22, 1976, in Indian Law Reporter, January-June, 1976, at i-l.
The policy encouraging the right of greater tribal self-government is also espoused by the highest court in our land. The Supreme Court noted in Bryan, 426 U.S. at 388-89, that Congress, in enacting Pub.L. No. 280, did not intend to undermine or destroy tribal governments, but rather contemplated their continuing vitality. The Court also recognized that present federal policy favors strengthening, rather than weakening, tribal self-government. 426 U.S. at 388-89. See also Santa RosaBand of Indians v. Kings County, 532 F.2d 655 (9th Cir. 1975).
This entire philosophy toward the Indian tribes militates against the imposition of state liquor licensing requirements on Indian tribes or their members within Indian country.
In any case, even under state law the Tribe would arguably be exempt from municipal licensing requirements by virtue of its status as a sovereign entity. Tribal sovereign status was strongly reaffirmed by the United States Supreme Court in two recent cases, Santa Clara Pueblo v. Martinez, 436 U.S. 49 (1978) and United States v. Wheeler, 435 U.S. 313 (1978). In Santa ClaraPueblo, the Court declared that "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign *Page 194 
powers" and that this immunity has not been abrogated by Congress. 436 U.S. at 58. Similarly, in Wheeler, the Court recognized that "[t]he powers of Indian tribes are, in general, `inherent powers of a limited sovereignty which has never beenextinguished."' 435 U.S. at 322 (quoting F. Cohen, Handbook ofFederal Indian Law, 122 [1945]) (emphasis in original).
It is my opinion, therefore, that the Supreme Court's interpretation of Pub.L. No. 277 and Pub.L. No. 280, the legislative histories of those two laws and current federal policy favoring the strengthening of internal tribal sovereignty strongly indicate that neither the state nor its political subdivisions have authority to impose local liquor licensing requirements on Indian tribes or their members where the Tribe has adopted its own ordinance in conformance with state law. Thus, the Mole Lake Tribe may validly sell alcoholic beverages within its reservation without a Town of Nashville liquor license.
BCL:JN:NB