WILLIAM J. ROGERS, Chairman, Menominee Indian Study Committee
Your predecessor raised the following questions regarding restoration of Menominee County to status as a federal Indian reservation:
1. Can the present structure of Menominee County be altered by division, partition abolition, or any other means? If so, what procedures are available for such alteration, and what are the implications of the various procedures available?
2. What is my position regarding the applicability of P.L. 280 to Menominee County and the reservation after restoration?
 I. Abolition, partition, or other alteration of Menominee County.
The Wisconsin statutes provide for alteration of a county's identity through division, the removal of portions from an existing county, and for merger with another county. Impetus for alteration may come from the legislature, or the counties involved. Article XIII, sec. 7, Wis. Const., provides: *Page 185 
 "DIVISION OF COUNTIES. SECTION 7. No county with an area of nine hundred square miles or less shall be divided or have any part stricken therefrom, without submitting the question to a vote of the people of the county, nor unless a majority of all the legal voters of the county voting on the question shall vote for the same."
Menominee County is subject to the above provisions and therefore cannot be divided or reduced in size without a prior majority vote of the county's legal voters. Menominee County voters would not have to vote if Menominee County were to receive territory from a neighboring county, however.
The statutes do not permit the abolition of a county if that would leave a "blank" on the map of Wisconsin. Section 59.997, Wis. Stats., sets up a detailed procedure for a county to follow when it is to consolidate with an adjoining county or counties. Consolidation may be initiated by the county boards involved, by joint agreement (subsec. (2)), or by petition of 20 percent of the electors of each county to be consolidated (subsec. (5)). Subsection (6) requires publication of the consolidation agreement for two successive weeks, and subsecs. (7) et seq. specify how the question is to be placed before the voters by referendum. The remainder of sec. 59.997 deals with election of new county officers, school districts, legislative representation, and similar matters.
You asked about the "implications" of the different procedures for changing a county's boundaries. Since I do not know what changes are now contemplated for Menominee County, I cannot comment except to say that the boundaries of many Wisconsin counties have varied in the past, and the litigation accompanying these changes may provide guidance as to the types of issues raised and the judicial resolution of such issues. See for example, State ex rel. Haswell v. Cram (1863), 16 Wis. 365. So long as the legislature or the counties involved comply with the appropriate statutory procedures, Menominee County could be merged entirely with an adjoining county; portions of Menominee County contiguous to another county could be merged with the latter; Menominee County could receive territory from or be divided among adjoining counties. The county would not be required to change at all, nor would it be required to reassume the county boundaries that preceded termination of the reservation and *Page 186 
creation of Menominee County. I would be able to comment further if a specific question arises in the future.
II. Applicability of P.L. 280 to Menominee Reservation
Your predecessor also asked my views on the applicability of Public Law 280 (67 Stat. 588, 28 U.S.C. sec. 1360 and18 U.S.C. sec. 1162), to Menominee County and the Menominee Reservation after the reinstatement of the Menominee Tribe "as a federally recognized sovereign Indian Tribe" pursuant to the Menominee Restoration Act (87 Stat. 770, 25 U.S.C. secs. 903-903f). Under Public Law 280 state jurisdiction over various matters both civil and criminal was extended to cover the affairs of certain Indian Tribes.
You noted in your request that the United States District Court of the Eastern District of Wisconsin was presented with the issue of the applicability of Public Law 280 to the Menominee Tribe and land after Restoration In the Matter of the Application ofDarrell Nacotee for a Writ of Habeas Corpus, Case No. 74-C-158. The District Court concluded that Public Law 280 survived Restoration. However, the judgment in that case was ordered vacated as moot by the Seventh Circuit Court of Appeals. Subsequently, the judgment was vacated by order of the District Court on October 20, 1975.
Where a judgment is vacated or set aside, as in Nacotee, it is as though no judgment had ever been entered, and it is not controlling precedent. See, e.g., 49 C.J.S., Judgments, sec. 306. Consequently, the applicability of Public Law 280 with respect to the Menominees after restoration must be determined through an analysis of the relevant legislation.
Congress did not, in the Restoration Act, expressly deal with Public Law 280 as it applied to the Menominee Tribe and land. It is, therefore, necessary to look not only to specific provisions in the Restoration Act but also to legislative history and current federal policy to answer your question.
It may be helpful as the first step in such an analysis to review the federal law as it has developed since the policy of leaving Indians free from state jurisdiction and control, sometimes referred to as the "Indian Sovereignty Doctrine," was first articulated by the U.S. Supreme Court in Worcester v. theState of Georgia *Page 187 
(1832), 6 Pet. 515, 8 L.Ed. 483. Mr. Chief Justice Marshall, speaking for a unanimous court, held that Indian nations were "distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all lands within those boundaries, which is not only acknowledged, but guaranteed by the United States." Id. at 557. Thus, the concept of Indian reservations as domestic dependent nations established the principle that state law could have no role to play within the reservation boundaries except with the assent of the Tribe itself, or in conformity with treaties, and with the acts of Congress. It was further determined that "[t]he whole intercourse between the United States and [the Indian tribes] is, by our constitution and laws, vested in the government of the United States." Worcester v. the State ofGeorgia, supra, at 561. See also United States v. Kagama (1886),118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228; Ex parte Kang-Gi-Shun-Ca(Crow Dog) (1883), 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030.
The Indian Sovereignty Doctrine has undergone considerable evolution in response to changed circumstances during the years since Worcester was decided. For example, in Williams v. Lee
(1959), 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251, the court summarized a number of cases that modify the Indian Sovereignty Doctrine.
 "Over the years this Court has modified [the Worcester
principle] in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized . . . . Thus, suits by Indians against outsiders in state courts have been sanctioned. . . . And state courts have been allowed to try non-Indians who committed crimes against each other on a reservation. . . ." Id., 358 U.S. at 219-220.
The more recent cases view the Indian Sovereignty Doctrine as a backdrop against which the applicable treaties and federal statutes must be read rather than providing a definitive resolution of the issues presented. McClanahan v. Arizona TaxCommission (1973), 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129. See also Mescalero Apache Tribe v. Jones (1973), 411 U.S. 145,93 S.Ct. 1267, 36 L.Ed.2d 114. Nevertheless, the court continues to acknowledge the fact that: *Page 188 
 "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory; they are a separate people possessing the power of regulating their internal and social relations." United States v. Mazurie (1975), 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706, 709, (Citing with approval Worcester v. Georgia, supra.)
The relevant statutes under consideration here, therefore, must be read with this tradition of sovereignty in mind in order to properly construe their meaning as intended by Congress.
As originally enacted on August 15, 1953, Public Law 280 granted civil and criminal jurisdiction to the State of Wisconsin in "all Indian country within the state except the Menomineereservation." (Emphasis added.) Initially, Public Law 280 was not applied to the Menominee Tribe because the Tribe had an effective law and order program. See Report of Orme Lewis, AssistantSecretary of the Interior, to Committee on Interior and InsularAffairs, 83d Cong., 1st Sess., Rept. No. 848 (July 1953).
On June 17, 1954, the Menominee Termination Act (68 Stat. 250,25 U.S.C. sec. 891, et seq.), was enacted. It was the purpose of the Act "to provide for orderly termination of Federal supervision over the property and members of the Menominee Indian Tribe of Wisconsin." The Act required the Tribe and the Secretary of the Interior to formulate a "plan for the future control of the tribal property and service functions now conducted by or under the supervision of the United States, including . . . services in the [field] of . . . law and order. . . . The responsibility of the United States to furnish all such supervision and services to the tribe and to the members thereof, because of their status as Indians, shall cease on April 30, 1961, or on such earlier date as may be agreed upon by the tribeand the Secretary [of the Interior]." (Emphasis added.) 25 U.S.C. sec. 896.
The removal of tribal property from federal trust status was the event that would signal the cessation of federal services to tribal members as Indians. Thereafter, the Tribe was to be subject to state jurisdiction. Section 899 of the Act provided:
 "When title to the property of the tribe has been transferred . . . the Secretary shall publish in the Federal Register an appropriate proclamation of that fact. Thereafter *Page 189 
individual members of the tribe shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians, all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction. . . ." (Emphasis added.)
Clearly, the congressional intent was to sever forever the relationship between the federal government and the Tribe. Without question the state was authorized to begin exercising its jurisdiction on the effective date of the land transfer. The plan went into effect on April 30, 1961. 26 Fed. Reg. 3726.
On August 24, 1954, at the request of the Menominee Tribe and upon the recommendation of the Secretary of the Interior, Public Law 280 was amended, thereby extending state civil and criminal jurisdiction to the Menominee Tribe and land as of that date. The Tribe's request was based generally upon its desire to accelerate the date on which it would become subject to the general application of the civil and criminal laws of Wisconsin under the Menominee Termination Act. (See, e.g., letter dated August 16, 1954 from Assistant Secretary of the Interior to Mr. Hughes.)
Public Law 280 and the Termination Act were direct manifestations of the termination policy expressed in House Concurrent Resolution 108, passed by Congress on June 9, 1953. (See, Senate Committee on Interior and Insular Affairs,Background Report on Public Law 280, Committee Print, 94th Cong., 1st Sess. (1975).) Termination continued as the official Congressional Indian policy until it was repudiated by the Menominee Restoration Act of December 22, 1973 (87 Stat. 770,25 U.S.C. sec. 903, et seq.).
It was the purpose of the Restoration Act to ". . . repeal the act terminating supervision over the affairs of the Menominee Indian Tribe of Wisconsin, reinstate such supervision, make available to the tribe the federal services lost through termination, and provide for the reestablishment of tribal self-government." S. Rep. No. 93-604, 93d Cong., 1st Sess. (1973) at 1. See also, H. R. Rep. No. 93-572, 93d Cong., 1st Sess. (1973). *Page 190 
Section 3 (b) of the Restoration Act expressly repealed the Menominee Termination Act and together with sec. 3 (c) reinstated all rights and privileges of the Tribe or its members lost pursuant to the Menominee Termination Act. The specific language is as follows:
 "(b) The Act of June 17, 1954, (68 Stat. 250; 25 U.S.C. § 891-902), as amended, is hereby repealed and there are hereby reinstated all rights and privileges of the tribe or its members under Federal treaty, statute, or otherwise which may have been diminished or lost pursuant to such Act.
 "(c) Nothing contained in this Act shall diminish any rights or privileges enjoyed by the tribe or its members now or prior to June 17, 1954, under Federal treaty, statute, or otherwise, which are not inconsistent with the provisions of this Act."
When the Restoration Act, specifically sec. 3 (b) and (c), is read in view of the Indian Sovereignty Doctrine, I believe it is clear that Congress intended to restore to the Tribe the full rights of tribal sovereignty which the Tribe enjoyed prior to the passage of the Menominee Termination Act, including the fundamental right to govern its internal affairs on its reservation. It follows that Public Law 280, insofar as it may have been applicable to the Menominees at the time of Restoration, thereafter ceased to have any force or effect with respect to state jurisdiction over the Menominee Tribe and land.
Section 3 (b) of the Restoration Act, quoted above, provides for the reinstatement of rights of the Tribe lost "pursuant to" the Termination Act. The right of the Menominee Tribe to be free from state jurisdiction and control was to end on April 31, 1961. Before that date, however, Public Law 280 was amended at the request of the Menominee Tribe and the Secretary of the Interior thereby making its provisions applicable to the Tribe. Thus, essentially the same jurisdictional transfer mandated in the Termination Act was effectuated immediately by mutual agreement in anticipation of termination. This was done merely for convenience and thus, as noted above, it is clear that the amendment of Public Law 280 to apply to the Menominee Tribe was done only as an extension of Termination policy. *Page 191 
The provisions in the Termination Act relating to the jurisdictional transfer did not on its face contain any qualifications. Public Law 280, however, in its general unilateral application did not authorize a complete assumption of jurisdiction by the state. 18 U.S.C. § 1162 codified Public Law 280 as it related to state jurisdiction over criminal offenses in Indian country. Section (b) qualified the state's jurisdiction as follows:
 "(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof. (Emphasis added.)
Similar qualifying language is contained in 28 U.S.C. § 1360, the codification of Public Law 280 as it related to state civil jurisdiction. The Menominee remained under the state's jurisdiction, pursuant to Public Law 280, from August 24, 1954, to April 30, 1961, when the broader grant of jurisdiction in sec. 899 of the Termination Act took effect.
A liberal construction of the Restoration Act, especially sec. 3 (b), leads to the conclusion that the right of the Menominee Tribe to be free from state jurisdiction, which was lost "pursuant to" the Termination Act, was restored to the Tribe. Based on the legislative history of the Restoration Act and appropriate consideration of the Indian Sovereignty Doctrine, there can be little doubt that Congress intended to restore the Menominee Tribe to its pre-termination status as a federally recognized sovereign Indian tribe.
In reaching this conclusion, I adopt the canon of construction consistently applied by the U.S. Supreme Court for over a century and a half that doubtful expressions in treaties and statutes dealing with Indians are to be resolved in their favor. See,e.g., Antoine v. *Page 192 Washington (1975), 420 U.S. 194, 43 L.Ed.2d 129, 134, 135,95 S.Ct. 615, and cases cited therein. I also believe that the Restoration Act can be read as remedial legislation which requires liberal construction in view of congressional policy existing at the time of enactment. See 82 C.J.S., sec. 388. See also 3 Sutherland, Statutory Construction, sec. 60.01.
The house and senate reports on the Restoration Act cited above reflect the general consensus that termination as a general policy was a tragic mistake and that the application of termination to the Menominees resulted in disastrous consequences for the Tribe. In order to correct the mistake and to repudiate termination as a policy, Congress enacted the Menominee Restoration legislation.
It is also significant that Congress repudiated the unilateral application of Public Law 280 to Indian country by providing in the 1968 Civil Rights Act (as codified in 25 U.S.C. secs. 1321-1323), that state assumption of jurisdiction can be accomplished only ". . . with the consent of the Indian Tribe occupying the particular Indian country or part thereof which could be affected by such assumption. . . ."
In view of the relevant legislation discussed herein, the various rules of statutory construction cited, the Indian Sovereignty Doctrine, and the congressional intent noted, I believe the courts, if squarely presented with the issues identified, would likewise conclude that Public Law 280 is no longer applicable to the Menominee Tribe and land.
Although it is my opinion that Public Law 280 is not now applicable to the Menominees, it is also my opinion that the state has jurisdiction over the Menominee Tribe and land until such time as the federal government, pursuant to the implementation of the Restoration Act, officially notifies the state that it, together with the Menominee Tribe, will assume jurisdiction. The Restoration Act requires the Secretary of the Interior and the Menominee Restoration Committee to "consult with appropriate State and local government officials to assure that the provision of necessary governmental services is not impaired as a result of the transfer of assets . . . ." 25 U.S.C. sec. 903d
(d). I, therefore, conclude that the Restoration Act and not Public Law 280 is the current basis for state jurisdiction. *Page 193 
You also have asked what will be the specific legal and jurisdictional implications for the state government and the local county and town governments in the event federal and tribal government civil and criminal jurisdiction is legally established in Menominee County. Since it is my opinion that state jurisdiction will be applicable generally only until the federal and tribal governments assume jurisdiction under provisions of the Restoration Act, your inquiry has major significance for all jurisdictions involved. During recent years, certain broad, general guidelines have been established by the United States Supreme Court in answering jurisdictional questions involving Indian reservations. Generalizations on this subject have become particularly treacherous, however, and should be avoided. SeeMescalero Apache Tribe v. Jones, supra.
The importance of your final question warrants special consideration in a separate opinion. I, therefore, defer further comment concerning jurisdictional implications for the governments involved to a subsequent opinion involving some specific factual context.
BCL:JDN