ZEL S. Rice II, Secretary, Department of Transportation
You requested my opinion on the nature and extent of the state traffic patrol's enforcement authority within Menominee County now that the state no longer exercises general, civil and criminal jurisdiction over the Menominee Indian Reservation. You note that in 1956, the Motor Vehicle Department requested an opinion of the Attorney General on the following questions, among others:
 "1. Must the trucks and automobiles belonging to the Menominee Indian Tribe or to individual Indians be [registered] under [sec. 341.04, Stats.] if operated on Wisconsin highways 55 and 47?
 "2. Must the drivers be licensed under [sec. 343.05, Stats.]?
"***
 "5. Can a Menominee Indian be arrested by a state officer on highways 47 and 55 within the boundary of the reservation for offenses such as operating an automobile while intoxicated and reckless driving?"
The resulting opinion (45 OAG 159 (1956)) answered these questions in the affirmative on the authority of Public Law 280 (67 Stat. 588, 28 U.S.C. sec. 1360, 18 U.S.C. sec. 1162). However, on February 27, 1976, the United States accepted the retrocession of jurisdiction then being exercised by the state within the Menominee Reservation pursuant to Public Law 83-661, (68 Stat. 795, amending Public Law 83-280, 67 Stat. 588) and the Menominee Restoration Act, (87 Stat. 770). Such jurisdictional transfer was accomplished in compliance with the Menominee Restoration Act and 25 U.S.C. sec. 1323 (82 Stat. 79). The jurisdictional change became effective on March 1, 1976 at 12:01 a.m. Central Standard Time. 41 F.R. 8516 (February 20, 1976). The Department of Transportation is, therefore, once again faced with the questions presented in the 1956 opinion. You ask for my opinion on the same question under current law.
To answer your questions it is necessary to carefully consider certain guidelines established by the United States Supreme Court *Page 117 
for resolving jurisdictional questions involving Indians and Indian reservations. References in this opinion to "Menominee Indians" or "Menominees" mean members of the Menominee Tribe as determined by the Tribe.
As I indicated in 64 OAG 184 (1975), judicial decisions concerning the exercise of state jurisdiction within the exterior boundary of Indian reservations are marked by adherence to the following fundamental principles among others. First, an Indian tribe such as the Menominee Tribe is a legitimate governmental entity possessing attributes of sovereignty over both its members and its territory and as such has the power to regulate its internal and social relations. Second, state law can have no role to play within the reservation boundaries except with the consent of the tribe itself or in conformity with treaties and acts of Congress or where the courts have determined that state law shall apply. These basic principles are encompassed in what is commonly referred to as the "Indian Sovereignty Doctrine."
The more recent cases resolve jurisdictional questions by reading applicable treaties and federal statutes against this backdrop of tribal sovereignty. McClanahan v. Arizona TaxCommission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). See also, Mescalero Apache Tribe v. Jones, 411 U.S. 145,93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); and Williams v. Lee, 358 U.S. 217,79 S.Ct. 269, 3 L.Ed.2d 251 (1959).
Since Public Law 280 is no longer applicable to the Menominee Reservation, there is no federal statute which authorizes the state to exercise general civil and criminal jurisdiction over tribal members within the exterior boundary of the reservation.
Before considering whether other legislation provides a basis for the exercise of the jurisdiction raised by your questions, it is necessary to consider whether the road system located within Menominee County is within the exterior boundary of the Reservation. For the following reasons it is my opinion that such roadways are within the Menominee Reservation as that Reservation was reestablished by the Menominee Restoration Act (87 Stat. 770, 25 U.S.C. secs. 903-903f), which repealed the Menominee Termination Act of June 17, 1954 (68 Stat. 250,25 U.S.C. sec. 891, et seq). *Page 118 
It was the purpose of the Termination Act "to provide for orderly termination of federal supervision over the property and members of the Menominee Indian Tribe of Wisconsin." The Act required the Tribe and the Secretary of the Interior to formulate a "plan for the future control of the tribal property and service functions now conducted by or under the supervision of the United States . . . . The responsibility of the United States to furnish all such supervision and services to the tribe and to the members thereof, because of their status as Indians, shall cease on April 30, 1961, or on such earlier date as may be agreed upon by the tribe and the Secretary [of the Interior]." 25 U.S.C. sec. 896.
The removal of tribal property from federal trust status was the event that would signal the cessation of federal services to tribal members as Indians. Thereafter, the Tribe was to be subject to state jurisdiction. As a result of termination, title to the road system within the Menominee Reservation was transferred to the State of Wisconsin.
You are no doubt aware of the general jurisdictional uncertainty that the Menominee termination-restoration process created. However, the Menominee Restoration Act and its legislative history supports the conclusion that Congress intended to restore the Tribe to the same jurisdictional status it enjoyed prior to termination. I believe that with the states' retrocession of jurisdiction, the congressional objectives with respect to the jurisdictional relationships were substantially accomplished.
You will recall that Menominee County and the Town of Menominee were created as a result of termination. See Menominee Tribe ofIndians v. United States, 391 U.S. 404, 409-410, 88 S.Ct. 1705,20 L.Ed.2d 697 (1968), and The Menominee Termination Plan,26 F.R. 3726 (April 29, 1961). The Menominee Reservation which had been created by the Treaty or Wolf River in 1854 (10 Stat. 1064), but later modified by the Treaty of February 11, 1856 (11 Stat. 679), thus became conterminous with Menominee County and the Town of Menominee. Chapter 259, sec. 2, [1959] Wis. Sess. Laws 300-01, sec. 2.01 (39m), Stats. The termination legislation did not abrogate the rights secured to the Menominee Tribe by treaty,Menominee Tribe of Indians v. United States, supra,391 U.S. at 411-413, nor was title to tribal land other than the road system extinguished as a result of termination. 26 F.R. 3726, supra. Clearly *Page 119 
the Menominee Tribe and the Menominee homeland remained substantially intact, notwithstanding termination.
It was the purpose of the Restoration Act to ". . . repeal the act terminating supervision over the affairs of the Menominee Indian Tribe of Wisconsin, reinstate such supervision, make available to the tribe the federal services lost through termination, and provide for the reestablishment of tribal self-government." S. Rep. No. 93-604, 93d Cong., 1st Sess. (1973) at 1. See also, H.R. Rep. No. 93-572, 93d Cong., 1st Sess. (1973).
Section 3 (b) of the Restoration Act expressly repealed the Menominee Termination Act and together with sec. 3 (c) reinstated all rights and privileges of the Tribe or its members lost pursuant to the Menominee Termination Act. The specific language is as follows:
 "(b) The Act of June 17, 1954, (68 Stat. 250; 25 U.S.C. § 891-902), as amended, is hereby repealed and there are hereby reinstated all rights and privileges of the tribe or its members under Federal treaty, statute, or otherwise which may have been diminished or lost pursuant to such Act.
 "(c) Nothing contained in this Act shall diminish any rights or privileges enjoyed by the tribe or its members now or prior to June 17, 1954, under Federal treaty, statute, or otherwise, which are not inconsistent with the provisions of this Act."
When the termination and restoration legislation are read against the backdrop of tribal sovereignty, I believe it is clear that Congress intended to restore to the Tribe the full rights of tribal self government which the Tribe enjoyed prior to the passage of the Menominee Termination Act, including the fundamental right to govern its internal affairs within the same territory that constituted the Reservation prior to termination.
Inquiry concerning state jurisdiction also requires consideration of the effect of the Act of March 3, 1901 (31 Stat. 1084, 25 U.S.C. sec. 311), which originally granted to the State or Wisconsin rights-of-way within the Reservation for the purpose of establishing public highways.
The Menominee Tribe had consented to the construction of such roads and highways through the Reservation in the 1856 Treaty, *Page 120 supra, ratified April 18, 1856 (11 Stat. 679). Article III provides in part:
 "To promote the welfare and the improvement of the Menominees, the free relationship between them and the citizens of the United States, it is further stipulated . . . .
 "(4) That all roads and highways, laid out by authority of law, shall have right-of-way through the lands of the said Indians on the same terms as are provided by law for their location through lands of citizens of the United States."
The Act of March 3, 1901, provides in material part:
 "The Secretary of the Interior is authorized to grant permission, upon compliance with such requirements as he may deem necessary, to the proper state or local authorities for the opening and establishment of public highways, in accordance with the laws of the state or territory in which the lands are situated, through any Indian reservation . . . ."
The courts have considered how this authorizing legislation affects jurisdiction on the highways within the Menominee Indian Reservation in three separate cases: State v. Tucker, 237 Wis. 310,296 N.W. 645 (1941); Ex Parte Kenoha, 43 F. Supp. 747, aff'd. (7th Cir. 1942), 131 F.2d 737; and In Re Fredenberg,65 F. Supp. 4 (E.D. Wis. 1946).
In State v. Tucker, the court held that the grant by the United States to Wisconsin of a right-of-way and permission to maintain a public highway running through the Menominee Reservation:
 ". . . includes by necessary implication the right of the state to take such possession of the land as will enable it to construct and repair and police the road, and to do all things necessary and incidental to the maintenance of a public highway. The fact that it is a public highway implies that no person, Indian or white may possess, occupy or use it to the exclusion of the general public or use it except on the same terms and upon the same conditions as the general public. . . ." 237 Wis. at 315-316.
The court upheld the conviction of a Menominee Indian for operating his truck upon that part of the state highway within the Reservation without having first registered it as required by Wisconsin Statutes. *Page 121 
A year later, however, in Ex Parte Kenoha, the Federal District Court for the Eastern District of Wisconsin questioned the soundness of the Tucker decision. The court ordered the release of a Menominee Indian who had been arrested and was being held by the state on a charge of negligent homicide (causing the death of another by operation of a vehicle while intoxicated) that was based on an alleged occurrence on a state highway within the Reservation. The court held that "[n]o express authority has been granted by Congress giving the State courts jurisdiction over an offense such as [negligent homicide]."
In affirming that decision the Seventh Circuit Court of Appeals distinguished Tucker on its facts.
 "We believe the case before us is materially different from the one before the Wisconsin Supreme Court. Our case deals with a crime, the punishment of a felony. The Wisconsin case dealt with a failure to register an automobile. Our case deals with the crime of manslaughter, covered by federal statute. The Wisconsin case deals with the application of an automobile registration statute to an Indian member of the same reservation." Application of Kenoha, 131 F.2d 737, 738 (7th Cir. 1942).
After concluding that the grant of a right-of-way under25 U.S.C. sec. 311 could not be construed as an implied grant of jurisdiction to the state over crimes committed by the Menominees, the court observed at 739:
 "It is true that the grant of a right to maintain a highway must carry with it certain implications respecting the protection of said highway against depredations. If, however, there were any implications arising therefrom which would subject the Indian members to the Wisconsin penal statute, they would be limited to such penal provisions as serve to protect and preserve the highway, such as speeding, impairing the highway, etc."
In 1946, the same federal district court that decided Kenoha
was faced with a fact situation in the case of In Re Fredenberg
nearly identical to Tucker, except that the Menominee Indian convicted in state court of failing to register his truck (used only within the Reservation boundaries, but on the state highway), was granted his application for a writ of habeas corpus. The In Re Fredenberg court *Page 122 
again criticized Tucker as unsound and held that the establishment of the highway did not alter the historic relationship of the Indian to the state: "There is no legitimate implication to be drawn that Congress intended any grant of jurisdiction when it permitted the state primarily for its own convenience to establish a state highway across the reservation."65 F. Supp. at 6. Federal district courts, of course, have no jurisdiction over state court decisions. See United States exrel. Lawrence v. Woods, 432 F.2d 1072, 1075-1076 (7th Cir. 1970),cert. denied, 402 U.S. 983.
Based on these authorities, especially State v. Tucker, I am compelled to conclude that 25 U.S.C. sec. 311 is authority for the state to exercise jurisdiction over members of the Menominee Tribe when they are using the public highways located within the Reservation. Such jurisdiction would extend to those activities and conduct that are necessary to protect the highways against depredations or that would impair their use as a public right-of-way. It is, therefore, necessary to consider whether the jurisdiction sought to be exercised by the state meets this general test.
In State v. Tucker, the court concluded that vehicles owned and operated by members of the Menominee Tribe must be registered under state law if operated on Wisconsin highways located within the Reservation boundaries. Based on that holding, the answer to your first question as to whether trucks and automobiles belonging to individual members of the Menominee Tribe must be registered if driven on state highways 55 and 47, must be answered in the affirmative. However, the enforceability of sec.341.04, Stats., against the Menominee Tribe as a governmental entity is now an issue in controversy before the courts. That litigation will enable the courts to consider the effect, if any, of the recent guidelines established by the United States Supreme Court for resolving jurisdictional issues such as those under consideration here. I express no opinion on that question here.
In your second question you ask whether members of the Menominee Tribe must be licensed under sec. 343.05, Stats., to operate motor vehicles on public highways within the reservation. In my opinion the answer is yes. The standards for licensing drivers set forth in sec. 343.05, Stats., are clearly designed to ensure that such drivers possess minimum qualifications before they are allowed to operate motor vehicles on the public road system. The licensing *Page 123 
provisions are thus designed primarily to protect and preserve the highway against use by unqualified persons who otherwise might impair the use of such highways by other members of the public.
It is true that the state does not require all operators of motor vehicles on state highways to have a Wisconsin license. Nor does the state require that all motor vehicles be registered under sec. 341.04, Stats. Thus, for example, licensed visitors from neighboring states are permitted to use state roadways without first securing a state license. Since neither the federal government nor the Menominee tribal government have established licensing provisions of their own concerning operation of motor vehicles by tribal members, or registration of motor vehicles owned by the Tribe or tribal members, the question of whether or not such licensing and registration provisions, if enacted, would preempt state jurisdiction over such matters need not be considered here. C.f. Red Lake Band of Chippewa Indians v.Minnesota, et al., Mn. , 248 N.W.2d 722 (Dec. 10, 1976).
In your final question you ask whether a Menominee Indian can be arrested by a state officer on highways 47 and 55 within the boundary of the Reservation for offenses such as operating an automobile while intoxicated and reckless driving. It is my opinion that such offenses clearly impair the use of the highways as public rights-of-way and, therefore, any person who commits such an offense is subject to arrest and prosecution by the state.
As the cases discussed above suggest, the state may not have jurisdiction to enforce certain criminal statutes against members of the Menominee Tribe where the offense occurs within the boundaries of the Reservation, whether on or off public highways.
Thus, for example, the federal government has exclusive trial jurisdiction over many offenses committed by Indian persons within the Menominee Reservation. Several such offenses are enumerated in 18 U.S.C. sec. 1153, the Major Crimes Act. Included are murder, manslaughter, rape, assault with intent to kill, assault with a dangerous weapon, and robbery, among others. In addition, the Assimilative Crimes Act, 18 U.S.C. sec. 13, is also applicable to the Menominee Reservation under certain circumstances. Thus, state criminal law becomes federal law except where the offense involves an Indian against the person or property of another Indian, or where the offense has been punished by the tribal court, or where by treaty, *Page 124 
exclusive jurisdiction over the offense is secured to the Indian tribe. See Williams v. United States, 327 U.S. 711, 66 S.Ct. 778,90 L.Ed. 962 (1946); also United States v. Sosseur, 181 F.2d 873
(7th Cir. 1950). Compare 18 U.S.C. sec. 1152.
The fact that the federal district court has exclusive jurisdiction to try offenses against the laws of the United States does not necessarily impede state and local officials from assisting in their enforcement. In fact, 18 U.S.C. § 3041
specifically authorizes such cooperation in the following terms:
 "For any offense against the United States, the offender may, by any justice or judge of the United States, or by any United States magistrate, or by any chancellor, judge of a supreme or superior court, chief or first judge of common pleas, mayor of a city, justice of the peace, or other magistrate, of any state where the offender may be found, and at the expense of the United States, be arrested and imprisoned or released as provided in chapter 207 of this title, as the case may be, for trial before such court of the United States as by law has cognizance of the offense. Copies of the process shall be returned as speedily as may be into the office of the clerk of such court, together with the recognizances of the witnesses for their appearances to testify in the case.
 "A United States judge or magistrate shall proceed under this section according to rules promulgated by the Supreme Court of the United States. Any state judge or magistrate acting hereunder may proceed according to the usual mode of procedure of his state but his acts and orders shall have no effect beyond determining to hold the prisoner for trial or to discharge him from arrest."
In United States v. Bumbola, 23 F.2d 696, 698 (N.D. N.Y. 1928), the court, in upholding an arrest by a state law enforcement officer without a warrant, held:
 ". . . The court is of the opinion that any peace officer of the state has not only the right, but that it is his duty, to arrest without a warrant any person committing an offense against the laws of the United States in his presence." *Page 125 
In Bircham v. Commonwealth, 238 S.W.2d 1008 (Ky. 1951), the court cited with approval the decision in U.S. v. Bumbola, by stating at 1016:
 ". . . In United States v. Bumbola [supra] . . . the court held that it is the duty of a peace officer of a state to arrest without a warrant any person committing an offense against the laws of the United States in his presence. Thus it will be seen that appellant, for quite a while previous to, and at the time of, his apprehension on First Street, and continuously thereafter, was in overt action in the commission of a felony in the presence of the officers attempting to take him in custody. It not only was their right, it was their duty, to arrest him. . . ."
It has also been held in Whitlock v. Boyer, 271 P.2d 484,77 Ariz. 334 (1954), that municipal police officers have the authority to arrest for federal crimes.
Under these authorities it is clear that Wisconsin law enforcement officers have the right and duty to arrest persons committing federal offenses in their presence on the Menominee Reservation; it being understood that trial jurisdiction over the offense rests exclusively with the federal district court.
I do not mean to imply that Wisconsin law enforcement officers have primary responsibility for law enforcement within the Reservation. In fact, it is anticipated that state officers will coordinate such law enforcement activities with federal and tribal officers whenever practicable. The need for cooperation among the various law enforcement agencies is recognized in the Menominee Restoration Act. The Act requires the Secretary of the Interior and the Menominee Restoration Committee to "consult with appropriate state and local government officials to assure that the provision of necessary governmental services is not impaired as a result of the [restoration process] . . . ."25 U.S.C. sec. 903 d(d).
BCL:JN *Page 126