PAUL M. CORNETT, District Attorney Shawano and Menominee Counties
You have requested my opinion on several matters involving the respective authority and jurisdiction of Menominee County and the Menominee Indian Tribe which arise under ch. 51, Stats. Chapter 51 is concerned primarily with the admission, commitment and treatment of all persons in need of services in four major disability areas related to: (1) alcoholism, (2) drug abuse, (3) developmental disabilities, and (4) mental illness. Chapter 51 also places certain funding responsibilities on the state and county governments to provide these services to county residents. Your first two questions are interrelated and, therefore, will be considered together. You ask: *Page 220 
 1. Is Menominee County responsible for providing these services to Indians residing on the Menominee Indian Reservation?
 2. Are Indians residing on the Menominee Indian Reservation residents of Menominee County for the purposes of obtaining services pursuant to Chapter 51?
Section 51.42 (3), Stats., provides in part:
 The county board of supervisors of every county, or the county boards of supervisors of any combination of counties, shall establish a community mental health, mental retardation, alcoholism and drug abuse program, make appropriations to operate the program and authorize the board of directors of the program to apply for grants-in-aid pursuant to this section.
Section 51.437, Stats., provides in part:
 (4) The county boards of supervisors have the primary governmental responsibility for the well-being of those developmentally disabled citizens residing within their respective counties and the families of the mentally retarded insofar as the usual resultant family stresses bear on the well-being of the developmentally disabled citizen. County liability for care and services purchased through or provided by a board established under this section shall be based upon client's county of residence except for emergency services for which liability shall be placed with the county in which the individual is found. . . .
 (5) The county board of supervisors shall establish community developmental disabilities services boards to furnish services within the counties. Such services shall be provided either directly or by contract.
These and related provisions in ch. 51 make clear that counties must provide these services to all persons residing within the respective county and in emergency situations to nonresidents as well. Menominee County is not excepted from having to provide these statutorily-mandated services. Nor does ch. 51 distinguish between Indian and non-Indian residents. *Page 221 
Unquestionably, Indians residing on the Menominee Indian Reservation also are residents of Menominee County for the purpose of obtaining services pursuant to ch. 51. You will recall that Menominee County and the Town of Menominee were created as a result of termination. See Menominee Tribe of Indians v. UnitedStates, 391 U.S. 404, 409-10 (1968), and the Menominee Termination Plan, 26 Fed. Reg. 3726 (April 29, 1961). The Menominee Reservation, which had been created by the Treaty of Wolf River in 1854 (10 Stat. 1064), but later modified by the Treaty of February 11, 1856 (11 Stat. 679), thus became coterminous with Menominee County and the Town of Menominee, ch. 259, sec. 2, 1959 Wis. Session Laws, 300-01, sec. 2.01 (39mm), Stats. The Menominee Reservation was reestablished by the Menominee Restoration Act (87 Stat. 770, 25 U.S.C. § 903-903f), which repealed the Menominee Termination Act of June 17, 1954 (68 Stat. 250, 25 U.S.C. § 891 et seq.). In 66 Op. Att'y Gen. 115 (1977), it was concluded that as a result of restoration the county and reservation boundaries once again are coterminous for jurisdictional purposes.
The opinions of this office have uniformly held that tribe members residing on Indian reservations located within a county enjoy the same entitlement to public services (such as those mandated in ch. 51, Stats.) that are available to other residents of the county. See, e.g., 37 Op. Att'y Gen. 213 (1948); 38 Op. Att'y Gen. 531 (1949). See also 70 Op. Att'y Gen. 36 (1981).
It is settled that under most circumstances state regulatory authority does not extend to Indians residing on reservations. (See discussion infra.) It is my opinion, however, that the state, in making available ch. 51 services to Indian residents is not exercising proscribed regulatory authority. Where tribe members voluntarily apply for public services and meet eligibility requirements, there appears to be no basis for denying such services. See 70 Op. Att'y Gen. 36 (1981) and cases cited therein.
Your final three questions also are interrelated and, therefore, will be considered together. You ask:
 3. May the Menominee Tribal Court make commitments to the Menominee County 51.42/ .437 Unified Board? *Page 222 
 4. Must the procedural requirements of Chapter 51 be followed by the Tribal Court in committing members of the tribe?
 5. May the Menominee Tribal Court incur expenses for Menominee County by ordering tribal members to participate in Menominee County 51.42/ .437 Unified Board programs?
In response to question number three, it is my opinion that the Menominee County 51.42/ .437 Unified Board has no authority to accept involuntary commitments ordered by the Menominee Tribal Court. It follows that your fourth question need not be considered. The answer to question five is no, which also follows from the answer to question three with regard to involuntary commitments. Whether Menominee Tribal Court action effects an involuntary or voluntary commitment regarding Menominee County 51.42/ .437 Unified Board programs is an important factor which must be considered in each case.
Services that counties are mandated to provide through boards established under secs. 51.42 and 51.437, Stats., are to be distinguished from jurisdictional considerations associated with commitments and detentions. As indicated above there is no legal basis for the Menominee County 51.42/ .437 Unified Board to deny services to Menominee Tribe members where such persons voluntarily request the service. There is, however, a jurisdictional impediment in those cases involving an involuntary commitment as under a court order.
The state, of course, has no jurisdiction to compel Menominee Tribe members to involuntarily submit themselves to the control of the 51.42/ .437 Unified Board or to any state agency charged with providing services in the ch. 51 disability areas. The Menominee Tribe and the federal government rather than the state have the responsibility to provide services where there is the need for an involuntary commitment. White v. Califano,437 F. Supp. 543, 556 (D. S.D. 1977). The Tribe has the power to regulate its internal relations generally to the extent this power has not been qualified by federal law or affected by the unique relationship between the Tribe and the United States. Seegenerally 64 Op. Att'y Gen. 184 (1975); 66 Op. Att'y Gen. 115 (1977). It is thus settled that the primary governmental authority to exercise general jurisdiction over tribe members *Page 223 
within reservation boundaries rests with the Menominee tribal government and the federal government.
Only infrequently have the courts allowed state jurisdiction such as that associated with involuntary commitments to be exercised against Indians within reservation boundaries absent specific federal legislative authorization. Although Wisconsin has been granted jurisdiction over civil causes of action to which Indians are parties under Pub.L. No. 280 (67 Stat. 558;28 U.S.C. sec. 1360; 18 U.S.C. sec. 1162), the Menominee Tribe was excepted from its coverage effective March 1, 1976. Since Pub.L. No. 280 does not apply to the Menominee, it is not necessary to decide to what extent it grants the state jurisdiction over Tribe members in matters arising under ch. 51, Stats. I have found no other specific federal legislative authorization. It is therefore necessary to consider whether there is any other basis to support state jurisdiction over involuntary commitment matters involving Menominee Tribe members.
The Supreme Court recently summarized the analytical framework utilized to determine under what circumstances a state's regulatory authority may lawfully be extended to tribal affairs within reservation boundaries. The Court in White Mountain ApacheTribe v. Bracker, 448 U.S. 136 (1980), observed:
 Congress has broad power to regulate tribal affairs under the Indian Commerce Clause [U.S.C.A. Const.] Art. 1, 8, cl. 3. See United States v. Wheeler, supra, 435 U.S., at [313,] 322-23 , 98 S.Ct., at 1085-1086 [(1978)]. This congressional authority and the "semi-independent position" of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be preempted by federal law. See, e.g., Warren Trading Post Co. v. Arizona Tax Comm'n, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); McClanahan v. Arizona State Tax Comm'n, [411 U.S. 164 (1973)]. Second, it may unlawfully infringe "on the right of reservation Indians to make their own laws and be ruled by them." Williams v. Lee, 358 U.S. 217, 220, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1958). See also Washington v. Yakima Indian Nation, 439 U.S. 463, 470, 99 S.Ct. 740, 746, 58 L.Ed.2d 740 (1979); Fisher v. District Court, 424 U.S. 382, 96 S.Ct. 943, *Page 224 47 L.Ed.2d 106 (1976) (per curiam); Kennerly v. District Court of Montana, 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971). The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important "backdrop," McClanahan v. Arizona State Tax Comm'n, supra, 411 U.S. at 172, 93 S.Ct., at 1262, against which vague or ambiguous federal enactments must always be measured.
448 U.S. at 142-43. See Oliphant v. Suquamish Indian Tribe,435 U.S. 191 (1978). Cf. Moe v. Confederated Salish and KootenaiTribes, Etc., 425 U.S. 463 (1976); Washington v. ConfederatedTribes, 447 U.S. 135 (1980).
The Court went on to caution, however, that: "[w]hen on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." 448 U.S. at 144.
In Califano, the court held that South Dakota state and county officials have no power to initiate or carry out procedures for the involuntary commitment of allegedly mentally ill Indian persons residing in Indian country because such action infringes upon the right of Indian people to govern themselves. Jurisdiction under Pub.L. No. 280 was not at issue. The court noted that:
 A person involuntarily committed is torn away from family, friends and community; after commitment the person may be allowed no greater liberty than a person convicted of a criminal offense. One can scarcely conceive how the power of the state could be brought to bear upon a person with any greater severity. *Page 225 
437 F. Supp. at 549. Applying involuntary commitment procedures to an Indian person residing on the reservation would, the court reasoned, require severe intrusions into the tribe's sovereignty, which infringement is not constitutionally permitted.
The court went on in an alternative holding to conclude that the involuntary commitment of allegedly mentally ill Indian residents of South Dakota who reside on Indian reservations is a subject area preempted by the federal government. The federal government, not the state government, has responsibility to provide these services under the trust relationship that exists between tribes and the United States. 437 F. Supp. at 556 et seq.
Also, the court rejected a suggested procedure which involved agreement between state and tribal officials to vest jurisdictional authority within the state. The court considered a proposal whereby tribal officials would take jurisdiction over the person and subject matter when a case appearing to necessitate involuntary commitment arises and thereafter the person would be transferred to the custody of state officials if commitment were necessary. The court concluded that this suggested procedure could not be utilized in view of Kennerly v.District Court of Ninth J.D. of Montana, 400 U.S. 423 (1971).
In Kennerly, the Court rejected unilateral efforts by the Black Feet Tribal Council to vest Montana courts with jurisdiction over civil matters which arose on the reservation and which involved Indian persons. The Court noted that Congress by enacting the Indian Civil Rights Act of 1968 (25 U.S.C. § 1322) established procedures that must be adhered to before a state can acquire civil and criminal jurisdiction over litigation involving Indians arising in Indian country. 400 U.S. at 428-29.
The situation you describe with Menominee Tribe members appears to be very similar to that considered by the court in Califano.
The court's reasoning in Califano is persuasive, and I have found nothing that would allow a different result with respect to the question of whether the Menominee Tribal Court can order the commitment of tribe members to state jurisdiction for care in state facilities. *Page 226 
This is not to suggest, however, that the State of Wisconsin, the Menominee Tribe and appropriate federal officials cannot cooperate to ensure that these types of services are made available to Menominee Tribe members. This could occur, for example, through the purchase of services from state government by the federal government in coordination with the exercise of tribal authority. Under such a contractual relationship jurisdictional authority over involuntary commitments would remain with the federal government or the tribal government throughout the period that care is provided in state operated facilities. C.f., Necklace v. Tribal Court of Three AffiliatedTribes, etc., 554 F.2d 845 (8th Cir. 1977).
In view of these considerations, the answer to your fifth question must be determined on a case-by-case basis. Although the Unified Board cannot acquire jurisdiction over a tribe member residing on the Menominee Reservation by virtue of a tribal court order, the Board would have to make services available to tribe members where there is a voluntary application. The critical consideration is whether the tribe member meets the eligibility requirements for such services and not his or her motivation for making application.
BCL:JDN